[Criminal No. 153.   Filed March 19, 1901.]

[64 Pac. 441.]

## JOHN R. WARD, Defendant and Appellant, v. TERRITORY OF ARIZONA, Plaintiff and Respondent.

1. CRIMINAL LAW—MURDER—LESSER OFFENSES INCLUDED—CHARGE TO JURY—INSTRUCTIONS—FAILURE TO REQUEST—NOT ERROR TO OMIT —REV. STATS. ARIZ. 1887, PEN. CODE, PARS. 1643, 1677, 1678, 1679, CONSTRUED—CHUNG SING v. UNITED STATES, 4 ARIZ. 217, 36 PAC. 205; TERRITORY v. WEST, 4 ARIZ. 212, 36 PAC. 207.—The Revised Statutes of Arizona, *supra,* provides: "The judge may then charge the jury, and must do so on any points pertinent to the issue, if requested by either party." Paragraphs 1677 and 1678, *supra,* permit either party to ask special instructions and prescribe the manner in which the same shall be settled. Paragraph 1679, *supra,* provides: "The court, in addition to the instructions provided for in the two preceding sections, shall, in charging the jury, state to them all such matters of law as it may think necessary for their information in giving their verdict." Upon a trial for murder there is no legal obligation upon the court to give instructions upon the several lesser grades of the offense, in the absence of a request, though there was evidence thereof.

APPEAL from a judgment of the District Court of the Second Judicial District in and for the County of Graham. F. M. Doan, Judge. Affirmed.

The facts are stated in the opinion.

Edwards & McFarland, for Appellant.

"The defendant is entitled to have the law of manslaughter given to the jury, if there is any evidence whatever to which it is applicable, no matter how weak or insufficient it may appear to the court." Kerr on Homicide, sec. 526; *Territory v. Friday,* 8 N. M. 204, 42 Pac. 62; *Territory* v. *Nichols,* 3 N. M. 76, 2 Pac. 78; *Crawford* v. *People,* 12 Colo. 290, 20 Pac. 769; *State* v. *Cody,* 18 Or. 506, 23 Pac. 895, 24 Pac. 895; *People* v. *Keefer,* 65 Cal. 232, 3 Pac. 818; *McLaughlin* v. *State,* 10 Tex. App. 355; *Reynolds* v. *State,* 14 Tex. App. 434; *Moore* v. *State,* 15 Tex. App. 22; *McNevins* v. *People,* 61 Barb. 307; *Adams* v. *State,* 29 Ohio St. 412.

An indictment for murder is an indictment for man-

Arizona 7—16

slaughter. *People* v. *Gilmore*, 4 Cal. 380; *People* v. *Apgar*, 35 Cal. 391; *People* v. *Lee Yune Chong*, 94 Cal. 379, 29 Pac. 776.

C. F. Ainsworth, Attorney-General, for Respondent.

Appellant not having made any request for the court to instruct the jury as to the crime of manslaughter, it was not error for the court to fail to charge on that point. *State* v. *Hanlon*, 62 Vt. 334, 19 Atl. 773; *Thurman* v. *State*, 32 Neb. 224, 49 N. W. 338; *Barr* v. *State*, 45 Neb. 458, 63 N. W. 856; *McClary* v. *State*, 75 Ind. 260; *State* v. *Marqueze*, 45 La. Ann. 41, 12 South. 128; *People* v. *Ezzo*, 104 Mich. 341, 62 N. W. 407; *People* v. *McNutt*, 93 Cal. 658, 29 Pac. 243.

DAVIS, J.—The appellant, John R. Ward, was tried at the October term, 1900, of the district court of Graham County, upon an indictment charging him with the murder of one C. C. Jackson. He was convicted of murder in the second degree, and sentenced to a term of fifteen years' imprisonment in the territorial prison. He appeals from the judgment of conviction and from the order denying his motion for a new trial.

It is assigned as error that the trial court failed and neglected to charge the jury on the law of manslaughter. The defendant admitted the killing of Jackson, and claimed in justification that the act was done in self-defense. The affray occurred in the Richelieu Saloon, at Clifton, on the evening of March 23, 1900. It appears from the evidence that about three quarters of an hour previous to the fatal rencounter the two men had a difficulty at the defendant's place of business, in the same town, over a game of monte, as a result of which the deceased left the place, accusing the defendant of robbing him. The defendant testifies that Jackson, in leaving, applied to him an opprobrious epithet, accompanied by the words, "If I had a gun, I would kill you." It also appears that a few minutes later Jackson went about, inquiring for a gun, and making threats against the life of the defendant; that this fact and the threats were shortly thereafter communicated to the defendant, who immediately put on his gun and started out, he says, for the purpose of going home to supper. He proceeded as far as the Richelieu Saloon, at the door of which he stopped. The deceased was

on the inside at the time, narrating in the presence of several bystanders his version of the recent gambling dispute, and repeating the charge that the defendant had been cheating or robbing him. Hearing these references being made to himself, the defendant entered the saloon. An altercation between the two men quickly ensued. There were a few exchanges of words, the lie was passed, one or two blows struck, and then the defendant, drawing his pistol, shot Jackson, the bullet entering the latter's body just below the left nipple and producing death in two or three hours. The deceased had no weapon. Concerning the relative actions and conduct of the parties immediately prior to the killing there is some slight controversy. As to the exact words which passed the witnesses do not agree, and the defendant himself makes contradictory statements. The testimony of the witnesses for the prosecution, however, tends strongly to show that the conflict was precipitated by the defendant. The testimony of five eye-witnesses is to the effect that the defendant first struck the deceased, and that when the latter struck a blow in return the defendant stepped back, drew his gun, and shot him. No witness except the defendant testified that the deceased made the first demonstration. His testimony, in so far as it relates to the circumstances of the killing, is substantially as follows: "I was going home to supper, and just as I got in front of the Richelieu Saloon I saw Jackson, and heard him talking to some men about me. I stood in the door, and then went in. Jackson was standing at the bar, with his elbow on the bar; and I walked past him to the far end of the bar, about ten or twelve feet from him. I said, 'I did not rob you, and I could not rob you if I wanted to,' and he says, 'You are not in your own house now, and cannot whip me,' and I said, 'You are a liar. I did n't rob you,' and he says, 'You are a liar. You did rob me,' and he came up near enough to hit me, and I threw up my left hand to ward off the blow, and he hit me a lick on the eye, and it reeled me back, and I put my hand on my eye, and drew my pistol and fired from my hip. The reason that I shot then was because I was afraid he would kill me, as the blow kind of dazed me. I stopped at the bar a minute, and some men came in, and then I walked to the door and gave myself up. I had heard several times that he was a bad man, and that

is why I shot as quick as I did. I did not know but that he would kill me then and there." On his cross-examination the defendant further testified: "It was about 5:30 o'clock in the evening when I left my place of business to go to supper. I had to pass the Richelieu Saloon on my way home. From what Change told me, I was very much afraid of Jackson. That is why I got my pistol and put it in my pocket. I was told he was a bad and desperate man. When I got opposite the door of the Richelieu Saloon, I heard Jackson say something about me, and I stopped a half a minute to listen to what he had to say, as I had heard that he had been making threats, and I wanted to avoid difficulty, and see if I could not square it with him. I went into the saloon to see if I could not fix the difficulty between us. I did not know whether or not he had a gun. I walked into the saloon and passed him five or six feet, when he said, 'Now, here is the man that robbed me.' I said, 'I did not rob you,' and he called me 'a greaser s—— of a b——.' He approached me and raised up his hand to strike me, and I threw up my hand to ward off the blow, but he hit me a very hard blow. He was a very strong man, and the lick staggered me back and dazed me. I threw my left hand over my eye, pulled my gun, and fired. From the force of the blow which I received, I thought he had something in his hand. Jackson was a bigger and stronger man than I am."

The trial court fully and fairly charged the jury as to the degrees of murder and the law of self-defense, and gave other general instructions, but gave no instruction defining or relating to the crime of manslaughter; nor was any requested by the defendant upon that point. Paragraph 1715 of the Penal Code provides that "the jury may find the defendant guilty of any offense the commission of which is necessarily included in that with which he is charged, or of an attempt to commit the offense." In the case before us it is conceded that if there was any evidence tending to prove that the offense was manslaughter, it is to be found in the testimony of the defendant alone. And the proposition is correct that the defendant is entitled to have the law of manslaughter given to the jury, if there be any evidence whatever to which it is applicable, no matter how weak or insufficient it may appear to the court; but the only question apparently neces-

sary for our determination here is whether error can be predicated upon the failure to instruct where no instruction was requested. Paragraph 1643 of the Penal Code prescribes the order in which a criminal trial shall proceed, and in the sixth subdivision thereof it is provided: ''The judge may then charge the jury, and must do so on any points pertinent to the issue, if requested by either party; and he must not state the testimony, but shall declare the law.'' Paragraphs 1677 and 1678 of the Penal Code permit either party to ask special instructions, and prescribe the manner in which the same shall be settled. Paragraph 1679 of the Penal Code provides: ''The court, in addition to the instructions provided for in the two preceding sections, shall, in charging the jury, state to them all such matters of law as it may think necessary for their information in giving their verdict.'' The supreme court, in passing upon these several statutory provisions, has previously held that ''the law of this territory does not make it the duty of the court to charge the jury, unless requested to do so in the manner therein mentioned.'' *Chung Sing* v. *United States,* 4 Ariz. 217, 36 Pac. 205; *Territory* v. *West,* 4 Ariz. 212, 36 Pac. 207. While under varying statutes there is some contrariety of judicial opinion with reference to the duty of a trial court in charging juries upon the different grades of felonious homicide, under our local law it is plain that, in the absence of a request therefor, there is no legal obligation upon the court to give instructions upon the several lesser grades of the offense. And while the defendant in this case would have been entitled to have had the law of manslaughter given to the jury, if he had so requested, and there was any evidence to justify it, having failed to request an instruction of that nature he cannot be heard to complain of his own neglect. *Barr* v. *State,* 45 Neb. 458, 63 N. W. 856, *Miller* v. *People,* 23 Colo. 95, 46 Pac. 111; *People* v. *Ezzo,* 104 Mich. 341, 62 N. W. 407; *State* v. *Marqueze,* 45 La. Ann. 41, 12 South. 128; *People* v. *Franklin,* 70 Cal. 641, 11 Pac. 797; *People* v. *McNutt,* 93 Cal. 658, 29 Pac. 243; *People* v. *Barney,* 114 Cal. 554, 47 Pac. 41; *People* v. *Arnold,* 116 Cal. 682, 48 Pac. 803; *People* v. *Winthrop,* 118 Cal. 85, 50 Pac. 390. The cases cited by the appellant's counsel in support of the proposition that it is the duty of the court, without request, to

instruct .the jury as to all the law applicable to the evidence were decided under statutes dissimilar to those of Arizona, and are not therefore in point. The record discloses no re-.versible error, and the judgment appealed from is affirmed.

Street, C. J., and Sloan, J., concur.