[Criminal No. 889. Filed June 6, 1940.]

[103 Pac. (2d) 256.]

ROBERT G. BURGUNDER, Appellant, v. THE STATE OF ARIZONA, Respondent.

412

Mr. C. T. McKinney, of Phoenix, Arizona, and Mr. R. M. Burgunder, of Seattle, Washington, for Appellant.

Mr. Joe Conway, Attorney General, Mr. W. E. Polley, Assistant Attorney General, Mr. Richard F. Harless, County Attorney, Mr. Leslie C. Hardy and Mr. Darrell Parker, Assistant County Attorneys, for Respondent.

ROSS, C. J.—Robert G. Burgunder was tried, convicted and sentenced to death upon a charge of murdering E. B. (Jack) Peterson on April 29, 1939, and he has appealed contending that his trial was not fair and impartial nor in accordance with law.

The trial lasted from June 26 to July 18, 1939. The transcript of the testimony covers 3,213 typewritten pages. As to who committed the homicide or how or why it was committed, there is no conflict. There may be variance in the details of the story but if so they come from the defendant's and not the state's evidence. There were many disputes and controversies in the course of the trial involving questions of procedure and law but the all-important question, and the only real one on the merits of the case, was whether defendant at the time he took Peterson's life was sane or insane. That we may have the picture before us in the consideration of defendant's complaints, we here give a condensed synopsis of the salient features of the evidence.

The defendant at the time was 22 years of age and a student at the Arizona State Teachers College at

Tempe, Arizona. His father resided in Seattle, Washington, and his mother at Alhambra, California. He had a weakness for gambling at poker, pin ball, and especially slot machines, and it appears by reason thereof his finances were very low just before the occurrence for which he was tried. On Monday, April 24th, he moved from the college dormitory to a hotel in the town of Tempe. He attended no classes thereafter except perhaps Tuesday. On Friday evening, April 28th, he sent a fictitious telegram from Phoenix to himself at Tempe stating:

"Father dying stop Could not reach you by phone stop leaving immediately by car for Seattle stop Follow by train or plane stop We cannot wait One Hundred dollars deposited your name in California Bank, Pasadena Office Pay school fees leave baggage Love Jack and Mother."

On April 29th this fictitious paper was delivered by Western Union to defendant at Tempe, and he used it to induce the college to cash his worthless check for $75 and to secure an endorser of a $45 worthless check, which he cashed at a Tempe bank. After obtaining this cash, he returned to Phoenix, arriving there about 11 o'clock in the morning. The first thing he did was to buy the .25 caliber Colt Automatic pistol and some cartridges from the United Loan and Jewelry Company at 331 East Washington Street, later used to kill Peterson. He went to a show for a short time, then, having loaded the pistol, to the intersection of Seventh and Van Buren Streets, Phoenix, where the through east-and-west travel is very heavy, and "stayed there for about two hours" hoping, as he said, "to get a car going east with a foreign license plate, a sedan with not more than one or two persons in it." He saw one car with the stated qualifications but the green signal was on, so of course it did not stop. He then decided he would try to get a car "some other

way.'' He went to Ed Rudolph's, a dealer in automobiles, and found a 1929 Ford which he bought for $35. This was between 2 and 3 o'clock in the afternoon. He told Rudolph's his name was Bob Lesser and that he lived in Los Angeles. He went to a store and bought a cheap white shirt and asked them not to fold the shirt and to use plenty of wrapping paper and tie with a heavy cord. These instructions were followed. He then drove the Ford east on Washington Street for some distance, stopped and removed the license plates. He drove thence to Thomas Road and 24th Street and parked the car off the road in some brush. He took the license plates and put them in the package containing the shirt and tied the package up again. He disconnected the spark plug, deflated one of the tires and threw the keys of the car in a near-by canal. He caught a bus into Phoenix and when he arrived stationed himself at First and Van Buren Streets, across from the Consolidated Motors Company, for about an hour or until around 6 o'clock, and during that time ''saw,'' as he said, ''another car pass . . . with the green light. . . . ''

He then visited the Consolidated Motors Company and told the sales manager he wanted to buy a Ford because his mother got sick from the sidesway of the Pontiac he had. Said he wanted to buy the Ford that night as he was leaving for California early next morning. He selected a four-door Ford sedan. The deceased Peterson, a salesman, and defendant drove this car around the streets of Phoenix for a short time and returned to the Consolidated Motors Company and picked up Ellis Koury, who was also a salesman, and the three of them left to go to Tempe to determine the trade-in value of defendant's car, which he claimed to have parked in a garage near that place. Peterson was at the wheel, Koury on his right and defendant in the back seat. He caused them to go through Tempe

and south thereof for a distance of four or five miles onto the desert, about a mile and a half south of the Indian village of Guadalupe. Shortly after passing through Tempe, defendant drew his pistol and announced to Peterson and Koury that it was "a stick-up" and directed Peterson, who was still driving, to turn to the right and south. He held his pistol on them until they arrived at the spot above named. He ordered Peterson and Koury to alight from the automobile and, holding the pistol on them, directed Koury to take Peterson's belt and necktie and tie his hands behind him and his ankles together, which was done. He then made Koury tie his own feet together and, this having been done, he first shot Koury, who was on the ground, twice in the head and then turned to Peterson, who was straining to break his bonds, and shot him three times. He robbed them and dragged their bodies some seventy feet from where they lay to a sand wash, got in the Ford car and drove away. He later said he made up his mind to kill Peterson and Koury on the way to the desert "because it was his best chance to get away." When he was told the penalty for stealing a car could not be so heavy, he said: "Don't forget those hot checks," and that he was out on parole from the state of Washington under a thirteen-year sentence.

After the killings, and a short distance east of Mesa, he removed the license plates from the car and put on it those he had taken from the Rudolph car, and fled from Arizona to Johnson City, Tennessee. In the meantime, on May 5th, the bodies of Peterson and Koury were found and their tragic fate was publicized throughout the United States by the newspapers and sheriff's office of Maricopa county. On Sunday, May 7th, defendant read in the local Tennessee papers of the finding of the bodies and, as he was returning from church and Sunday school to the home of a family

with whom he had secured lodging, he was arrested by Earl Sell, high sheriff of Washington county, Tennessee. He had in his possession the Ford sedan belonging to the Consolidated Motors Company or to Peterson, the pistol he had bought in Phoenix on April 28th, a belt of Koury's, and other things that identified him as connected with the homicides. After his apprehension, and before his trial, his story given on several occasions and to several persons was, in the main, as we have detailed above. At his trial he deviated therefrom in the respect that he insisted that he had a confederate who, he said, did the actual shooting. He refused to state who his confederate was, or to describe him, or to give any clue whatever as to his identity.

After the state closed its case, Mr. C. T. McKinney, attorney for defendant, stated the grounds upon which the defendant would rely. He told the jury:

" . . . the defendant will produce evidence here before you in a detailed history of his life from early boyhood, throughout his life in the State of Washington, throughout a period of time prior to the time when he got in trouble, and was incarcerated in a reformatory in the State of Washington, a detailed description of his life afterwards, the effect of his life in the reformatory upon him afterwards, the effect of the life there, and the incident that happened afterwards upon his mental condition at the time of the acts charged in this case. . . . "

In support of this defense, the defendant's father and mother testified in some detail about defendant's actions, his moods, periods of depression and elation; told of his holding up a drug store in Seattle, Washington, and shooting at an officer who attempted to arrest him; about his being sent to a reformatory, of his associations therein, of his experiences and observations in the office of his father, a public prosecutor,

how these things had affected his attitude towards society, and of his appetite for gambling.

Defendant as a witness in his own behalf outlines his defense as follows:

"My desire for going on the stand from the first was prompted by one reason and has been added to another. I, at no time desired to go on the stand for the purpose of saving my life. That may seem like a strange statement, but when I left, left Arizona, I had no particular desire to continue to live. I was making an effort, I was trying something which I did not think would succeed. There were only two things before me now and that is a plea of insanity, either life imprisonment or the death penalty, and I have no desire for the life imprisonment. I had two years in the reformatory. That was more than I could stand very well. I have no desire to continue life in con-- finement so the story I am telling you gentlemen is not a story designed to create pity or sympathy. It is a story which happens to be the truth and which I desire to tell for those reasons. And I am not asking you, and I would appreciate it if you would disregard Mr. McKinney's asking you to save my life because I am young, because I have any good points, whatever they may be. As a lawyer that is his duty. My mother will probably be on the stand and because she loves me, knows me for what good points I do have, she may also ask that my life be spared. And I will ask you to disregard this also because if the story which I am about to relate to you is a lie, then there is no reason whatsoever that I should not be given the death penalty. And if the story which I am about to relate to you is the truth, then I am concealing a man who, for whatever his reason, is a murderer and for that reason also I should probably be given the death penalty. There is only one reason I can see why I should continue to live and that is if at that time I was insane, and I am not saying that I was insane for I do not know. . . . "

Thirty-two errors are assigned, or attempted to be assigned. Some of them are so completely without

merit we will not consume time or space to state or discuss them. Many of them do not conform with the court's rules but when they present a question of a possible violation of defendant's rights we will disregard this defect.

██ Defendant's first assignment makes the point that he was not legally committed and that therefore his motion to set aside the information should have been granted. The record on this motion shows that defendant was taken before the committing magistrate of East Phoenix Precinct by the sheriff on May 15th, and that he was represented in the proceeding then had by his attorney C. T. McKinney; that he was advised of the charge against him and that his attorney waived the reading of the complaint; that at such time the preliminary hearing was set for May 22d; that on said date defendant was present and represented by the same attorney, C. T. McKinney, but the magistrate's record does not show that the complaint at this time was read to defendant as required by section 4950, Revised Code of 1928. We think on this showing the court properly denied defendant's motion to set aside the information. We had a similar question before us in *Miranda* v. *State,* 42 Ariz. 358, 26 Pac. (2d) 241, 242. In that case we said:

"While the failure to read the complaint was therefore erroneous, yet in view of the fact that defendant was represented by an attorney who had read the complaint, and that defendant himself had previously had it read to him, we think it would be entirely too technical to reverse the case on that ground, since it is obvious that none of the defendant's substantial rights could have been prejudiced. *People* v. *Stein,* 23 Cal. App. 108, 137 Pac. 271; *State* v. *Clark,* 4 Idaho 7, 35 Pac. 710; article 6, § 22, Constitution of Arizona."

While the facts here are slightly different from the facts in the Miranda case, we are satisfied the same ruling should be made. The failure to read the com-

plaint at the preliminary could not possibly have misled the defendant or his attorney. Defendant by his silence will be deemed to have waived the reading of the complaint at the preliminary hearing. Both the defendant and his attorney of course knew what the charge was.

■ The defendant complains because the court refused to grant his motion to be tried for the killing of Koury at the same time and by the same jury that tried him for the killing of Peterson. In other words, he asked the court to consolidate the two cases. Section 4980, Revised Code of 1928, provides that "The indictment or information must charge but one offense." It would have been error to have granted the motion because it is clear that the two killings, under the circumstances, constitute two separate and distinct offenses.

■ It was impossible to present the evidence without making reference to Koury's death. Defendant contends the court should have instructed the jury as to the limitations of the use of such evidence. If defendant wanted such an instruction, he should have asked for it. Subd. 6, sec. 5042, Id.; *Ward* v. *Territory*, 7 Ariz. 241, 64 Pac. 441, 3 Ann. Cas. 137; *Douglas* v. *State*, 26 Ariz. 327, 225 Pac. 335; *Sullivan* v. *State*, 47 Ariz. 224, 55 Pac. (2d) 312; and cases cited therein.

The correctness of the court's order overruling defendant's motion for a change of venue is questioned. The application for the change was on the ground that a fair and impartial trial could not be had in Maricopa county. This application was supported by the affidavits of defendant and C. T. McKinney, his attorney. The latter stated in his affidavit that he had talked with a large number of citizens of the county, had listened to conversations and had become convinced defendant could not secure a fair and impartial trial; that defendant was a comparative stranger in

422

the county, while deceased was well known, having been a member of the highway patrol and well acquainted; that it was impossible to find any person who had not formulated a fixed opinion of defendant's guilt or innocence. Defendant's affidavit set out that since April 29th

"the local press, editorially and in news stories, had instigated, fostered and created prejudice against the affiant by reason of the publication of what is purported to be the facts in relation to the defendant's guilt or innocence, and have published pictures, purported to be connected with the facts in the defendant's case, that have been odious to the general public and have caused them to form in their minds a great bias and prejudice against this affiant to such an extent that it is impossible for him to have a fair and impartial trial in the County of Maricopa, . . . ''

The affidavits of nine well-known citizens of the county were filed with the court controverting defendant's showing. These affidavits recited that affiants had talked with many citizens and residents of the county and that the persons with whom they had conversed stated that they had not formulated or expressed any opinion as to defendant's guilt or innocence and were not biased or prejudiced against him. Each affiant expressed the opinion that defendant could have a fair and impartial trial in the county.

The statute provides that the affidavits in support of the application for change of venue may be rebutted by the state. Sec. 5023, Id. Thus the question as to whether defendant could have a fair and impartial trial in Maricopa county became an issue for the trial court to hear and determine. Whether the application should have been granted is largely a matter of discretion of the trial court which we will not disturb unless it clearly appears that such discretion was abused. *Adkins* v. *State,* 42 Ariz. 534, 28 Pac. (2d) 612; *Robertson* v. *Territory,* 13 Ariz. 10, 108

Pac. 217, affirmed, (9 Cir.) 188 Fed. 783, 110 C. C. A. 489; *Elias* v. *Territory,* 9 Ariz. 1, 76 Pac. 605, 11 Ann. Cas. 1153.

It is next claimed the court erred in denying defendant's request to defend himself and in appointing counsel for him over his objection. When the ruling here complained of was made the case was in Division No. 3 of the Superior Court, before the Honorable HOWARD C. SPEAKMAN presiding. It occurred on June 20th, six days before the trial date. C. T. McKinney, who had up to that time represented defendant, filed with the court a formal request to be permitted to withdraw from the case on the ground that defendant would not cooperate with him and had discharged him. The court (Judge SPEAKMAN) asked defendant if he and his attorney were unable to get along and if he wanted to discharge McKinney and try the case himself, and defendant answered: "That is right . . . I have a legal right to represent myself. . . . " The court thereupon granted McKinney's motion to withdraw from the case and immediately entered an order appointing him as defendant's attorney and ordering him to be in court on Monday morning, June 26th, "to represent this defendant." In the meantime, on June 26th, defendant disqualified Judge SPEAKMAN to try the case by filing affidavits of bias and prejudice as provided by section 5022, Id. Judge SPEAKMAN thereupon assigned the case to Honorable ARTHUR T. LaPRADE, a Judge of the Superior Court of Maricopa county presiding over Division No. 5 thereof. When the case came on for trial on June 26th, Judge LaPRADE entered an order vacating Judge SPEAKMAN'S order denying defendant the right to defend himself and informed defendant that such right was given him by the Constitution and that he should have it if he desired, or that he could be defended by counsel if he saw fit.

Defendant, instead of giving the court an answer as to whether he wished to defend himself, countered as follows:

"Previously to Judge SPEAKMAN'S order, I had every intention of defending myself. I had the evidence which I desired to have presented, and I had the method in which (I) wished to do it. Since this order was given, I have had no opportunity to form any of these things, to subpoena the witnesses, because Mr. McKinney and I have never agreed, and because he has refused to subpoena witnesses I have asked him to subpoena, and get written testimony which I wished him to get, I am by no means ready to go on trial on my own behalf. . . .

"I wouldn't have a possible chance of going on trial at this time because I have no case prepared, I have no opportunity to prepare a case after Judge SPEAKMAN'S orders.

"I would like to stand upon the record. I would like to ask the court to continue the case until such time as I am ready to go to trial. . . . "

The court advised defendant he would have to proceed with the trial and gave him ten minutes to consult with his father and anybody else he desired. Defendant then stated:

"I am not ready at this time for trial. I am not prepared to defend myself at this time because of the reason which I have previously stated. If the court insists that I go to trial at this time contrary to my own wishes and desires, I am forced to ask the court to appoint an attorney to represent me, because otherwise I could not possibly present any fair defense."

The court in response said: "In view of your request, then, I will appoint Mr. McKinney." In answer to the question by defendant "Do I have the right to examine and cross examine witnesses in my own behalf?" the court said "Yes."

Defendant insists that the action of the court in first denying him the right to defend himself and

thereafter granting him such right violates section 24, article II of the state Constitution, which provides:

"In criminal prosecutions, the accused shall have the right to appear and defend in person, and by counsel, . . . "

It does not seem to us defendant's contention is right either in fact or law. The court's action was induced by defendant's own equivocation. It appears he was able to employ an attorney and did so when first charged with the offense and Judge SPEAKMAN'S order requiring such attorney to continue his services was for the protection of defendant who, presumably, because of his youth and inexperience and the nature of his defense of insanity, was unable to defend himself intelligently. This order, although in the interests of defendant, was probably erroneous. If, however, he was entitled to defend himself without the assistance of counsel, the court offered to let him do so. He asked for counsel. Actually, he was permitted "to appear and defend in person, and by counsel." Sec. 24, art. II, *supra*. He was given, and he accepted, full measure of the constitutional right.

No complaint is made of the court's failure to postpone the trial.

■ It appears from the record that defendant's father, Robert M. Burgunder, was an attorney in the state of Washington; that he had practiced law some 27 years, and that he had been a public prosecutor for about 14 years of that time. He was present at the trial from the beginning assisting the defense. The day following the selection of the jury, he was appointed by the court as associate counsel and thereafter actively participated in the trial and, although doubtless in deep distress over his son's predicament, showed that he was an able and skilled lawyer, familiar with the principles of criminal law and procedure. We think he realized that if defendant was in-

sane—his only defense—he needed to be defended by counsel, for an insane person cannot defend himself. It is only persons who are *sui juris* and mentally competent who are permitted to defend themselves without the aid of counsel. Note to *State of Minnesota* v. *Townley,* 17 A. L. R. 266.

■ Defendant complains because the court admitted evidence showing that he had committed other crimes than the one charged, relying upon the general rule when the defense is not insanity. That rule is completely disregarded, however, when the defense is insanity. Under such a defense defendant is permitted to give to the jury his personal history and in doing so he is not restricted to any particular acts or conduct. If he open that field of inquiry for the purpose of showing he was insane when he committed the act, the state may also explore the same field and present to the jury any pertinent discovery not disclosed by the defendant. The rule is stated by Wigmore on Evidence, Third Edition, volume 1, section 228, as follows:

"The first and fundamental rule, then, will be that *any and all conduct* of the person is admissible in evidence. There is no restriction as to the kind of conduct. There can be none; for if a specific act does not indicate insanity it may indicate sanity. It will certainly throw light one way or the other upon the issue. 'Upon this I believe that no difference of opinion will be found to exist,' said Mr. Justice Patteson, in a celebrated case, 'as to the principle on which such evidence is admissible: Every act of the party's life is relevant to the issue.' There can be no escape from this consequence. There is no distinction in kind (whatever there may be in degree) between one or another piece of conduct as evidence to be considered; *some* inference is always possible."

■ Defendant complains that the court permitted the state to introduce in evidence an enlarged picture of the dead body of Peterson and insists that such

evidence could have no purpose except to arouse the indignation of the jury against defendant. We think this evidence might well have been omitted but do not believe, under the circumstances, that it was prejudicial. It showed deceased's hands tied behind him, his feet tied together and one of his trouser pockets turned inside out. It corroborated the state's theory of how and why the murder was committed. *People v. Williams*, 14 Cal. (2d) 532, 95 Pac. (2d) 456.

Dr. Joseph Catton, of San Francisco, a specialist in nervous and mental diseases, testified as an expert in behalf of the state on the question of defendant's sanity. The defendant complains because the rule for the exclusion of witnesses was not enforced against Dr. Catton. Dr. Catton was not a factual witness. His evidence was opinion evidence based upon the facts as disclosed by other witnesses and there was therefore no reason to exclude him from the courtroom during the trial and many reasons why he should be allowed to remain in the courtroom.

Dr. Catton testified that he had asked defendant if he would permit him to examine defendant for his sanity and that defendant had refused such request. This, it is claimed, violates the constitutional rule (sec. 10, art. II, Const.) against compelling a party to be a witness against himself. It was optional with defendant to undergo the examination by Dr. Catton or not as he pleased. Had he been forced to submit to such examination he might justly complain. He was only asked if he would permit such examination and he refused, as was his right.

Much of defendant's brief is devoted to a criticism of the form of the hypothetical question put to Dr. Catton and his answer thereto. Whether the question was in exact legal form or the answer as limited and restricted as it ought to have been we think is immaterial under the circumstances. The

premise for the question was the entire evidence, that of the state and the defendant, and it was all assumed to be true. The witness answered that defendant was sane, that is, that he knew the nature of his act and that it was wrong. Defendant contends that it was error to permit the witness to state that the defendant knew right from wrong and he cites to sustain this contention *People* v. *O'Brien,* 122 Cal. App. 147, 9 Pac. (2d) 902, a decision of the District Court of Appeal; also *People* v. *Jacobs,* 9 Cal. App. (2d) 704, 51 Pac. (2d) 128, likewise a decision of the District Court of Appeal. See *People* v. *Woods,* 19 Cal. App. (2d) 556, 65 Pac. (2d) 940, for comment on Jacobs case. However, in *People* v. *Dawa,* 15 Cal. (2d) 393, 101 Pac. (2d) 498, it was held by the Supreme Court of California that the accepted test of sanity in criminal cases is whether defendant could distinguish between right and wrong. That, we think, is the test adopted by this court in *West* v. *State,* 24 Ariz. 237, 208 Pac. 412, 418. Even though it be granted that the hypothetical question included some things that should have been omitted, and that the answer of the witness was somewhat argumentative, we do not think it was prejudicial.

There was no evidence showing, or tending to show, that the defendant was insane at the time he killed Peterson. That he knew the nature of his act is evidenced by the fact that he planned it in secret and executed it in secret as planned and hastened from it as fast and quickly as he could. He knew he would be punished if apprehended because he knew what he was doing constituted not only robbery but murder in its perpetration. The evidence shows that defendant was above the average in intelligence; that he actually participated in his own defense, at times taking charge of it and at other times consulting or counseling his father and McKinney in the examination

and cross-examination of witnesses and other matters in the progress of the trial. The jurors needed no expert opinion to convince them defendant was sane. Their own common experience with their fellowmen showed that defendant was activated in his conduct by the power of reason like other rational human beings. If there had been an iota of evidence of insanity in the case, experts for the defense surely would have been called as witnesses. Counsel (C. T. McKinney) who argued the case for defendant in this court very frankly stated that, although defendant had been examined by experts with a view of using them as witnesses, none would testify defendant was insane at the time he killed Peterson.

We think this case is one in which what defendant rather testily calls "the substantial justice rule" should be applied. We have frequently invoked such rule to avoid the expense and delay of a retrial when from the evidence it appeared no different result was likely in a new trial or where the error complained of did not affect the result. The rule is not liked by criminals or persons charged with crime. It has a tendency to lessen their chances of escaping from just punishment, and we think it protects society without depriving an accused of any statutory or constitutional right. One of the earlier cases wherein this rule was invoked is *West* v. *State, supra.* In that case errors in the trial were manifest but we said:

" . . . The Legislature of this state, in section 1170 of the Penal Code [now section 5146, Revised Code of 1928], announces as a guide for this court the following very salutary and common sense rule:

" 'After hearing the appeal, the court shall give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties, and no judgment in any criminal case shall be reversed for technical error in pleading or proceedings when upon the whole case it appears that substantial justice has been done.'

"This rule is a restatement of section 22, article 6, of the Constitution. We have said in *Birch* v. *State*, 19 Ariz. 366, 171 Pac. 135:

" 'Cases may be reversed in this court only where the record affirmatively shows error prejudicial to some substantial right of a defendant.'

"And in *Bush* v. *State*, 19 Ariz. 195, 168 Pac. 508, we said:

" 'We are persuaded that had the record been free of the error suggested for reversal the verdict of the jury would not have been otherwise.'

—and refused to reverse the case for that reason. The tendency of legislation and judicial decision. in recent years has been to require of a defendant, complaining of his conviction, to show that some right of his has been prejudiced, before setting aside a conviction. The effort is not to disregard his guaranties under the law and Constitution, but to strip the trial of all the common-law niceties of pleading and procedure that formerly had been used as a means of delay and sometimes to defeat justice. California has a constitutional provision, worded differently from ours, but conveying the same general meaning, and the California court has held that:

" 'No presumption of prejudice arises from the mere fact of error. On the contrary, it must affirmatively appear to this court that the defendant has been substantially injured by the error complained of.' *People* v. *Lawlor*, 21 Cal. App. 63, 131 Pac. 63; *People* v. *O'Bryan*, 165 Cal. 55, 130 Pac. 1042; *People* v. *Fleming*, 166 Cal. 357, 136 Pac. 291, Ann. Cas. 1915B, 881; *People* v. *Lapara*, 181 Cal. 66, 183 Pac. 545; *People* v. *Bonfanti*, 40 Cal. App. 614, 181 Pac. 80.''

Under this rule, injury is not conclusively presumed, as formerly, from error but must be shown. *Lawrence* v. *State*, 29 Ariz. 247, 240 Pac. 863; Id., 29 Ariz. 318, 241 Pac. 511; *Turley* v. *State*, 48 Ariz. 61, 59 Pac. (2d) 312; *Riley* v. *State*, 50 Ariz. 442, 73 Pac. (2d) 96; *Conner* v. *State*, 54 Ariz. 68, 92 Pac. (2d) 524.

 Defendant complains that "Counsel for the state was guilty of misconduct in making a prejudicial inflammatory closing argument.'' In the body of

defendant's brief are quoted excerpts from the closing argument of a deputy county attorney but it does not appear that any objection was made at the time to the language used in such excerpts. Whatever was said was a strong forceful appeal, in sharp cutting phrases of condemnation, for a death verdict from the jury and, while its effect upon the jury might have been to convince them that defendant should die for his act, we do not think that any error was committed thereby. In the recent case of *Sullivan* v. *State,* 47 Ariz. 224, 55 Pac. (2d) 312, 317, we said of a like situation:

"Nor does it appear, even in the motion for a new trial, that defendant objected to these remarks or requested the court to instruct the jury to disregard them. Such being the case, even assuming that they were made, the general rule is that no question in regard to such remarks is reserved for review in this court. *Post* v. *State,* 41 Ariz. 23, 15 Pac. (2d) 246; *Strickland* v. *State,* 37 Ariz. 368, 294 Pac. 617; *Britt* v. *State,* 25 Ariz. 419, 218 Pac. 981. . . . " See, also, *Hoy* v. *State,* 53 Ariz. 440, 90 Pac. (2d) 623.

On the fourth day of the trial the court asked the jury panel of twenty-nine then in the jury box if anyone had approached any of them and tried to talk to them about the case or had offered any bribe. Counsel for defendant asked the court if it had any facts upon which to predicate the question and was told the court had no definite information—just a matter of precaution. Because of such inquiry, the defendant moved that the court discharge the jury and declare a mistrial. The court's refusal to grant this motion is assigned as error. It is contended by the defendant that the court's inquiry implied that defendant, or someone for him, had been trying to corrupt or influence the jury. In denying the motion, the court said:

"I will advise the jury at this time with reference to the motion that was just here made that the court in making the inquiry was making the inquiry as a matter of precaution and cast no inference against the defendant or his counsel or anyone connected with his defense and the jury are so instructed. The jury are now instructed that if there was or can be any inference taken from the remarks of the court in making the inquiry yesterday, you are instructed to disregard the same wholly and let it have no bearing at all in your consideration in passing upon the guilt or innocence of this defendant."

If the court erred in making the inquiry, the above statement surely cured the error.

Defendant contends the court should have given an instruction on second degree murder. Homicide committed under the circumstances here shown is defined by the statute as murder in the first degree. Murder perpetrated in the commission of certain named crimes, among them robbery, is murder of the first degree and all other kinds of murder are of the second degree. Sec. 4584, Id.

Defendant complains of some of the instructions given and also of the court's refusal to give certain instructions asked by him. We have carefully considered this assignment and cannot see wherein any error was committed either in the instructions given or in the refusal of those asked. The instructions were full and, in so far as we can see, correct. We again quote from *West* v. *State, supra,* as follows:

"The reasons prompting murder are often very slight and very trivial. . . .

"One taking a life in such circumstances, when haled into a court of justice, before a jury of his peers, can have in the very nature of things but one available defense, and that is insanity. It is a good defense, one recognized by the law, and, if established, entitles the defendant to an acquittal. This fact was prominently emphasized in the trial. Defendant was accorded every opportunity to show his inability to dis-

cern the difference between the right and the wrong of his act in taking life. The jury were fully advised as to what constitutes insanity and their duty to acquit defendant, if they entertained a doubt as to his sanity. Had there been serious doubt as to whether defendant took Smith's life, the collateral evidence wrongly admitted, might have been prejudicial, but under the defense of insanity its admission was probably beneficial.''

We feel that the defendant was tried by a fair and impartial jury and that if any errors were committed in the trial they were not prejudicial.

The judgment of the lower court is affirmed.

LOCKWOOD and McALISTER, JJ., concur.