521 P.2d 626

**STATE of Arizona, Appellee,**

**v.**

**Corey Axon KARSTETTER, Appellant.**

**No. 2787.**

Supreme Court of Arizona,
En Banc.

April 19, 1974.

Rehearing Denied May 21, 1974.

**540**

Gary K. Nelson, Atty. Gen., by Michael C. Anderson, Asst. Atty. Gen., Phoenix, for appellee.

Ross P. Lee, Maricopa County Public Defender by Paul J. Prato, Former Deputy Public Defender, and John Foreman, Deputy Public Defender, Phoenix, for appellant.

HAYS, Chief Justice.

The defendant, Corey Karstetter, appeals from a guilty verdict and a life sentence, for the crime of first degree murder.

Defendant, at the time of his extremely brutal crime, was 27 years old and had an I.Q. of 130. In the evening of October 15, 1972, while employed as a security guard at Mesa Community College, he entered the pantry where a fifty-year-old woman was working. He helped her lift a heavy tray from the freezer and carry it to a table. He then, without warning, struck her with his fist so hard that he knocked some of her teeth out and broke one of his fingers. He continued beating her, and when she sank to the floor he kicked her about the head and strangled her. After she lost consciousness or had died, he raped her. He then carried her body to the truck in which she drove to work, moved it some distance away, threw the keys away, and went back to work. He sought to give the impression that he had not left his post by not signing out or calling in, as required by his work rules.

Right after the crime, he called his girl friend to pick him up, got medical attention for his broken finger, and returned to work. On his return, he was seen by the maintenance man who said defendant spoke and appeared completely normal except that his arm was in a sling.

The victim's daughter found her mother dead in the truck and police were called. When taken into custody and after having been given his Miranda warnings, defendant freely confessed. There is no contention that his statements to the police were involuntary. The fact that defendant committed the crime is uncontradicted. The sole defense was temporary insanity.

The police booking was recorded on video tape and it, as well as the testimony of the policeman involved, all clearly indicated that defendant appeared normal when they questioned him at 3:00 A.M. on the day following the crime.

Dr. Enos, a Phoenix psychologist, and Dr. Tuchler, a Phoenix psychiatrist, testified for the defendant. They admitted that the defendant was sane up until the moment he first struck the victim and immediately after he had finished raping her, but claimed that he was insane for only the few minutes, it took to commit the crime. As the prosecution put it, defendant was sane for all of his 27 years except 15–20 minutes, a situation which Dr. Tuchler referred to as "Bizarre" and which he conceded was the only case like it which he had encountered in 35 years of practice.

Defendant did not take the stand.

Throughout the night and into the morning defendant was questioned, but not abused. To all who observed him, he was calm, collected and normal. He showed no signs of any mental aberration.

Several weeks before trial, his counsel employed the two doctors to examine him and later to testify as to his mental condition at the time of the crime. Each saw defendant days after the crime and each saw him on four different days for less than an hour each time. They worked as a team. Their diagnosis was "cerebral dysfunction." It was considered by them to be organic, although there was no supporting evidence from an electroencephalogram or complete neurological examination. It did appear that defendant suffered from a mental quirk which caused him to see things as mirror images. This ends to result in a learning disability, especially as to things learned by sight.

The evidence further detailed the frustrations and antagonisms which beset the defendant. The experts indicated that all of this led up to an "explosion" which was triggered by something unknown.

This is the way the doctors analyzed him —sane until the crime; not psychotic or sociopathic; then temporarily insane. After the "explosion" (the crime), he became sane again almost immediately. The doctors explain their diagnosis by the fact that defendant had no reason or motive for his acts. They believe that even the rape was not intended, or in any way a motive, but was merely part of the explosion.

■ The test of insanity in Arizona is whether the person knows the difference between right and wrong and the nature and quality of his acts. Burgunder v. State, 55 Ariz. 411, 103 P.2d 256 (1940). Enough evidence in the form of expert testimony was admitted to throw doubt upon defendant's sanity and thus shift the burden of proving his sanity beyond a reasonable doubt to the State. State v. Corley, 108 Ariz. 240, 495 P.2d 470 (1972).

Against the testimony of the two doctors, the State presented the testimony of everyone who observed and talked with defendant right after the crime. In addition, some very enlightening answers were elicited from Dr. Tuchler by the county attorney. The doctor insisted he knew the legal definition of insanity in Arizona was the ability to tell right from wrong. Yet, what he described was the "irresistible impulse" situation. He testified at great length, but his testimony included the following:

"Now this explosive explosion does constitute a disease of a mind, which is a mental disorder. It is difficult to talk about the quality of the act. He knows it is violent at the time he is doing it, but he can't control it. He knows you don't strike a woman. . . . He knew it at the time but he couldn't help it. . . . *I felt that he knew at the time that there was something wrong in what he was doing. I have to make that formal admission. He recognized it was wrong to do this, but he couldn't control it. . . . If I were to state this is irresistible impulse, you would be absolutely correct."* (Emphasis added).

■ While the doctors testified that at the time of the incident, defendant did not know the difference between right and wrong, the above language contradicts this proposition and, together with the State's testimony of several witnesses who saw defendant much sooner than did the doctors, the question was properly submitted to the jury. Neither that submission nor the instructions are attacked, and we hold that there was sufficient evidence in the record to justify the guilty verdict brought in by the jury.

Defendant does not argue these points. His position is that errors were made by the trial court which were so prejudicial as to require reversal. Defendant's contentions are four in number.

I

DID THE TRIAL COURT ERR IN CONTINUING THE TRIAL BEYOND THE 60–DAY LIMIT?

■ Defendant knew that his defense was going to be based upon temporary insanity as early as October when he had his first examination by his doctors. Despite this fact, his counsel did not file notice

of his intention to plead not guilty by reason of insanity until six days before the trial. On the following day, the county attorney moved to have defendant examined by two other psychiatrists. The motion was granted two days before the trial, at which time the court, sua sponte, stated that it was obviously impossible for the doctors to make the examinations and submit reports in time for the trial, and that because of the late notice by defendant, there was good cause to waive the sixty-day period. We agree with this pronouncement. We have held that the sixty-day rule exists for the purpose of protecting a defendant from unreasonable delays and not for the purpose of allowing the guilty to escape on technicalities. State v. Bowman, 105 Ariz. 307, 309, 464 P.2d 330 (1970).

## II

### DID THE STATE'S DOCTORS' TESTIMONY THAT DEFENDANT REFUSED TO SPEAK TO THEM CONSTITUTE REVERSIBLE ERROR?

■ The facts surrounding this issue are unusual. Previous to the calling of the State's experts, defendant moved in limine to exclude their testimony. When they came to the jail to examine the defendant, he refused to answer any questions because the answers might incriminate him. He did this on advice of counsel. He argued that the doctors' statements of the reason why they could not examine him would be an improper comment on his right to remain silent and, under the rule laid down in Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), a mistrial would have to be declared.

The trial court recognized the unfairness of allowing defendant to use his doctors to prove his temporary insanity and prevent other doctors from disproving that condition. It was finally decided—over defendant's objection—that the State's doctors would be asked whether they had been able to examine defendant, and they would reply only "No," without stating that the reason was that defendant had taken the Fifth Amendment. Dr. Bendheim gave the proper answer and a mistrial was denied. However, when Dr. Duisberg was asked whether he was able to examine defendant, he answered: "He refused." A motion for a mistrial as to this proceeding was also denied.

Dr. Tuchler was asked during cross-examination if his conclusions were based *exclusively* on what defendant had told him during the examinations. The doctor answered that such was the fact and that "[t]hat's all, yes. I have no other information." At another point in the examination, the doctor was asked whether the basis for saying that there was no premeditation on the part of the defendant was primarily defendant's statements during the examination, and the doctor answered: "I have to agree with that, yes."

This problem has been the subject of litigation in other states. In New York, for example, in Lee v. County Court, 27 N.Y. 2d 432, 318 N.Y.S.2d 705, 712, 267 N.E.2d 452, 457 (1971), the trial judge struck the insanity plea when defendant refused to be examined by the state's doctors. On appeal, it was held that while the plea could not be stricken, the evidence of defendant's doctors could be excluded as a proper sanction for defendant's refusal to cooperate. *Accord*, Parkin v. State, 222 So.2d 457 (Fla.App. 1969). Certiorari was denied by the United States Supreme Court in both cases. In short, in those jurisdictions, before the trial begins, and in the absence of the jury, defendant must show that he has cooperated with the state's doctors, or his own evidence of insanity will be excluded from the jury.

In Arizona, in the case of Burgunder v. State, 55 Ariz. 411, 427, 103 P.2d 256 (1940), the State's physician testified that the defendant had refused to permit an examination. Defendant, on appeal, claimed that this testimony violated the constitu-

tional provision against compelling a party to be a witness against himself. This court held that no error had been committed.

Twenty-five years later, the subject was again before this court in State v. Schantz, 98 Ariz. 200, 214, 403 P.2d 521 (1965), and we said:

> "There is an inference arising out of the failure of the State to call expert medical witnesses in rebuttal, that the defendant's evidence as to insanity is true because uncontradicted. . . . Where a defendant files a notice of reliance on insanity and thereafter offers expert testimony based upon an examination to which he submitted himself the refusal of an examination by competent medical experts representing the State may be shown to negative that inference." 403 P.2d at 530.

For all the above reasons, we are of the opinion that defendant's second point is not well taken.

### III

### DID THE PROSECUTOR COMMIT REVERSIBLE ERROR IN HIS CLOSING ARGUMENT, BY REFERRING TO THE POSSIBILITY THAT THE DEFENDANT WOULD GO FREE IF FOUND NOT GUILTY BY REASON OF INSANITY?

■ We have read and reread the prosecutor's first closing argument to the jury. The only thing which appears in it, relevant to this assignment of error, is the following:

> "You are going to be instructed . . . that if you find the defendant not guilty by reason of insanity, it doesn't mean freedom for him. Dr. Enos did not recommend in his report that this guy go to a mental institution. Dr. Enos did not recommend in his report that he undergo psychiatric study for prolonged periods of time in some type of an institution. Doesn't that tell you anything about the sham aspect of

this defense? When I asked him about it he said 'Well, yes, I think he should have psychiatric care.' Well, why didn't you recommend it, doctor? 'Because he's not insane.' "

That is not a direct statement that a verdict of not guilty because of insanity would allow the defendant his freedom. That is an argument that the defense was a sham and that the doctor did not even recommend treatment for defendant. The remarks come very close to what is claimed by defendant, but stop short of the mark. In addition, defendant's counsel made no objection and no motion for a mistrial. Instead, he chose to discuss the subject with the jury himself. He argued:

> "You do not take a person who has committed this offense . . . and you release him back into society. There is no argument about that. Yet [the prosecutor] wants to harp on it."

> \*　\*　\*　\*　\*　\*

> "The last instruction is the most important and it is probably a question that you have carried with you from the beginning of this trial to the end. It's something that until very recently in this state we had no answer to, because the prosecutor has told you that you are going to let this man go back on the streets. . . . If I were sitting in your place, and I thought it was a question of convicting him or finding him not guilty by reason of insanity and putting him back on the streets, I would probably convict him because we can't tolerate that. But our law has changed. . . . If the defendant is found not guilty by reason of insanity, then a second hearing shall be held before this jury to determine whether the defendant's mental condition justifies commitment to an appropriate mental institution. . . . A verdict of not guilty by reason of insanity does not mean in and of itself freedom from punishment. . . . This means not like you have read in the newspapers where one day a person is in the mental institution and

the next day some crazy director of the mental institution releases him. . . . This defendant, if you commit him to a mental institution, cannot be released until twelve people like yourselves review the entire case and decide whether he is dangerous or not."

■ This opened up the whole issue, and the prosecutor then used his closing rebuttal speech to answer the above remarks, in the following way:

"Yes, it is true that if an individual beats a murder case by a verdict returned of not guilty by reason of insanity, it is true that if he is committed, then the only way he can get out is having it submitted to a jury . . . that he is now sane and no longer dangerous to society. But he has to be committed first, and that's why it's crucial that Dr. Enos didn't put in his report that this guy should be committed. Dr. Fuchler didn't put in his report or didn't state the individual should be committed. . . . Why? Because they both know full well that . . . he is not insane."

At this point, defense counsel objected that the prosecutor was misleading the jury. There was some argument, and the judge read parts of A.R.S. § 13–1621.01 to the jury, after which the prosecutor continued his argument, as follows:

"That means if you find him not guilty by reason of insanity and say he should be sent to a mental institution . . . what will happen is that he will be examined . . . the psychiatrist will look at him and say he's sane . . . this guy may have a reading disability but we can't hold him here . . . because he is not insane as a matter of law, and he does go free."

No objection was made to those statements. The court instructed the jury that if it found him not guilty by reason of insanity, a second hearing would be held before the same jury to determine whether defendant's condition justified commitment to a mental institution, and that a verdict of not guilty by reason of insanity "does not mean that the defendant, if his present condition justifies commitment . . . will be confined to a hospital for the mentally ill to be released only after a jury trial. . . ."

Defense counsel apparently was satisfied with the instructions and made no objection to them. In our opinion, no reversible error was committed in the prosecution's closing or rebuttal arguments.

## IV

### DID THE PROSECUTOR'S ALLUSION TO DEFENDANT'S FAILURE TO TESTIFY AT TRIAL CONSTITUTE ERROR?

■ The prosecutor must not comment on the defendant's failure to take the stand. Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106. However, his comments in this case were not directed to the defendant's failure to testify. The things that he said were:

"There are only two people who know what happened on October 15, 1972 at the time this woman died. One of them is dead. But the statement which is in evidence, that the defendant made to the police . . ."

\* \* \* \* \* \*

"The only evidence we have from anyone regarding what exactly happened between these two is from the defendant as he gave it to the police and as he gave it to his psychologist and his psychiatrist. . . ."

Defendant's argument on this issue is easily answered. The prosecutor's statement was not actually a comment on defendant's failure to take the stand. See State v. Pierson, 102 Ariz. 90, 425 P.2d 115 (1967), in which the prosecutor stated:

" 'The only man in the world besides the defendant that can testify as to whether he was there or not . . . is Mr. Sego.' "

\* \* \* \* \* \*

" 'Now, the defendant hasn't said, I didn't do it. He says, I wasn't there, . . .' "

425 P.2d at 116.

In that case we held that the statements, viewed in the proper context, did not focus the jury's attention on defendant's failure to take the stand. Defendant's complaints about the argument of the prosecutor are unfounded.

We must again point out that defendant's only defense was insanity. As to the fact of his committing the crime charged, there appears to be no question. Even a flat statement as to defendant's failure to take the stand, cannot in this context be considered prejudicial.

We have carefully read the 600-page transcript and find no fundamental error.

Affirmed.

CAMERON, V. C. J., and STRUCKMEYER, LOCKWOOD and HOLOHAN, JJ., concur.