878 P.2d 1352

The STATE of Arizona, Appellee,

v.

Joe D. CORNELL, Appellant.

No. CR–91–0072–AP.

Supreme Court of Arizona,
En Banc.

Aug. 2, 1994.

Grant Woods, Atty. Gen. by Paul J. McMurdie, Jon G. Anderson, Phoenix, for appellee.

Neal W. Bassett, Phoenix, for appellant.

OPINION

FELDMAN, Chief Justice.

In November 1990, a Maricopa County jury convicted Defendant Joe D. Cornell of first degree murder, attempted first degree murder, aggravated assault, and first degree burglary. The court sentenced him to death on the murder conviction and imprisonment on the remaining counts. Defendant filed a timely notice of appeal. This court has jurisdiction of the appeal pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. §§ 13–4031 and 13–4033(A).

**FACTS AND PROCEDURAL HISTORY**

Defendant killed Margaret Daphne Dad ("Daphne") and wounded her father, Victor Dad ("Victor"), at the Arizona Department of Transportation ("ADOT") building in Phoenix on December 8, 1989. For several years before that time, Defendant and Daphne had maintained an "on and off" relationship and had a child together. At some point, Daphne attempted to break off the relationship and began seeing another man. Defendant refused to accept this and harassed Daphne by making hundreds of telephone calls to her home and her two places of employment. He threatened at least once to kill her if she did not answer his calls. A few days before the shootings, Defendant followed Daphne and her new boyfriend out of the ADOT building and started an altercation. This incident resulted in an aggravated assault conviction against Defendant, which is discussed in more detail in § II(C) below.

On December 8, 1989, shortly after 8:00 a.m., Victor drove Daphne to her job at the ADOT building. Defendant's daughter was also in the truck. On the way, Victor saw a truck driven by Defendant stopped at a stop sign. Victor recognized the truck as one belonging to Defendant's brother. Defendant quickly pulled into traffic behind Victor and Daphne, caught up to them, and followed close behind. Victor tried to elude Defendant by driving erratically but was unsuccessful.

When they arrived at the ADOT building, Victor pulled directly in front of the door and let Daphne out. As Daphne made her way to the building, Victor left his truck and approached Defendant. Defendant got out of his truck. After seeing Victor approach, Defendant produced a pistol, assumed a "shooter's stance," and opened fire. One shot hit Victor in the arm as he tried to take cover behind his truck, in which his granddaughter was still sitting. Another bullet hit a window next to the door through which Daphne had just passed into the building.

Leaving Victor disabled, Defendant followed Daphne into the building. Daphne ran into an office area in which several of her coworkers were present, but for some reason she fell to the floor. Defendant reached the spot where Daphne lay and stood above her. At this point there appears to have been an exchange of words, in which Daphne said "damn you," and Defendant called Daphne a "bitch." Defendant then fired his pistol at least three times, but only one of these shots hit Daphne. She died from this wound shortly thereafter.

Defendant then fled the building. In so doing, he threatened one or more people with the gun so that they would not interfere with his escape. After leaving the building, Defendant returned to the truck and drove away. Some time later, he placed a call to his sister, and during the conversation they discussed the fact that Daphne had been killed. Later, Defendant drove to a Chandler church and sought counsel from the pastor. That afternoon, the pastor took Defendant to the Chandler police station, where Defendant voluntarily surrendered. Police found the murder weapon in his truck.

A Maricopa County grand jury indicted Defendant for first degree murder, attempted murder, three counts of aggravated assault, and one count of burglary. The State later amended the indictment, dropping one count of aggravated assault. The trial court appointed the public defender's office to represent Defendant, but before trial Defendant moved to represent himself. The court granted this motion but appointed a public defender to work with him as advisory counsel. The court also appointed an investigator and a paralegal to assist Defendant in preparing his case. Defendant's sole defense at trial was that he had suffered a form of

temporary insanity during the shooting. The jury convicted Defendant of the first degree murder of Daphne, the attempted murder of Victor, and one count each of aggravated assault and first degree burglary, but acquitted Defendant on the second aggravated assault count. The judge sentenced Defendant to death for the murder, twenty-one years in prison for the attempted murder, fifteen years for the aggravated assault, and fifteen years for the burglary, with the prison terms to be served consecutively to each other and to the sentence on the murder count, as well as to the sentence on his previous aggravated assault conviction. The judge also ordered restitution to the victims. Defendant alleges that several errors occurred during his trial. We discuss each allegation in turn.

## TRIAL AND APPEAL ISSUES

### A. Reading the indictment to the jury

Defendant alleges that the trial court erred in having the clerk read the indictment to the jury at the beginning of the trial. The indictment in this case contained the following language: "The grand jurors of Maricopa County, Arizona, accuse Joe D. Cornell on this 15th day of December 1989, charging that in Maricopa County, Arizona...." Defendant argues that telling jurors another group of citizens has already determined that there is evidence to believe he is guilty tends to make the jurors less vigilant than they should be; therefore, his rights to due process and to an impartial jury under the United States and Arizona Constitutions were violated. We cannot agree.

■ Because Defendant failed to object to the reading of the indictment, he is precluded from arguing the issue now, absent fundamental error. Ariz.R.Evid. 103(a) and (d); *State v. Bible*, 175 Ariz. 549, 572, 858 P.2d 1152, 1175 (1993). It was not error, fundamental or otherwise, to read the indictment to the jury. Ariz.R.Crim.P. 19.1(a)(1), requires the clerk to read the indictment. Moreover, this court rejected a similar claim in *State v. Amaya–Ruiz*, 166 Ariz. 152, 174, 800 P.2d 1260, 1282 (1990), *cert. denied*, 500 U.S. 929, 111 S.Ct. 2044, 114 L.Ed.2d 129 (1991). In that case, the defendant argued

that use of the words "true bill" and the grand jury foreperson's signature were prejudicial surplusage. This court affirmed the conviction, relying in part on *United States v. Ramirez*, 710 F.2d 535 (9th Cir.1983).

In *Ramirez*, as in the present case, the defendant complained about the jury hearing the phrase "the grand jury charges." *Id.* at 545. The *Ramirez* court rejected this argument because the trial court had instructed the jury that the indictment was not evidence against the accused and raised no inference of guilt or innocence. Here, similar instructions were given. We think this instruction sufficient to avoid any prejudice. Given the instruction, the reading of the indictment certainly did not violate Defendant's due process rights.

### B. Court's refusal to pay for videotapes of television interviews with witnesses to the shooting

■ Shortly before trial was scheduled to begin, Defendant asked the court to authorize payment to several local television stations for news videotapes of witness interviews made just after the shootings. The court noted that the trial was imminent, and Defendant could have presented the request much earlier. The judge also said he believed Defendant could get the information in other ways, such as by sending out the investigator.

Defendant now argues that the court's failure to pay for the tapes deprived him of his rights to a fair trial and due process guaranteed by U.S. Const. amend. 5 and Ariz. Const. art. 2, §§ 4 and 24. He advances several reasons for the proposition that later interviews would not have been an acceptable substitute for the original interviews.

■ Because Defendant was indigent, the trial court had both a constitutional and statutory duty to provide him with certain essential tools of trial defense. *United States v. Sims*, 617 F.2d 1371, 1375 (9th Cir.1980); *see also* A.R.S. § 13–4013(B); *Ake v. Oklahoma*, 470 U.S. 68, 76–77, 105 S.Ct. 1087, 1092–93, 84 L.Ed.2d 53 (1985). However, an indigent defendant does not have an unlimited right to all items that he believes

are necessary for his defense. *State v. Yanich*, 110 Ariz. 172, 176, 516 P.2d 308, 312 (1973). The decision to expend public monies to assist the defense rests within the trial court's sound discretion. *State v. Clabourne*, 142 Ariz. 335, 342, 690 P.2d 54, 61 (1984); *State v. Knapp*, 114 Ariz. 531, 540–41, 562 P.2d 704, 713–14 (1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978). Whether a court's refusal to provide such funds is a violation of due process depends on whether there were good reasons for the requested expenditure. *State v. Watson*, 120 Ariz. 441, 451, 586 P.2d 1253, 1263 (1978), *cert. denied*, 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979).

At the time Defendant made this request, there were other alternatives to paying for the tapes. One alternative was to obtain free copies. It is undisputed that one station had already provided its tape free of charge and that another station had agreed to make its tape available, hoping the court would later order payment. Only one channel said, "no payment, no tape." Had the free tapes revealed useful information, Defendant could then have made a convincing argument to the court regarding the need for the third tape. Another alternative was to conduct further investigation to at least determine what was on the tapes and then explain to the court why they would be useful.

We recognize that it may be difficult or even impossible for a defendant to show the need for a certain piece of evidence, or to later show prejudice, without ever having seen it. However, we also recognize that courts cannot, consistent with limited budgets, be put in the position of having to pay for every item a defendant thinks may be useful. There must be sufficient reason to think that the assistance is likely to be reasonably necessary for presentation of an effective defense. *State v. Michael Apelt*, 176 Ariz. 349, 366, 861 P.2d 634, 651 (1993). Thus, a defendant requesting a court to authorize payment should at least advise the court of the general lines of inquiry the requested material will help to pursue. *Cf. Mason v. Arizona*, 504 F.2d 1345 (9th Cir. 1974), *cert. denied*, 420 U.S. 936, 95 S.Ct. 1145, 43 L.Ed.2d 412 (1975); *People v. Faxel*,

91 Cal.App.3d 327, 154 Cal.Rptr. 132 (Cal. App.1979).

Here, only one tape was unavailable without prepayment, and Defendant failed to explain to the court specifically how it would have helped his case. Nor is there any evidence in the record that Defendant used the court-appointed investigator to conduct interviews to find out what the tape contained so that Defendant could justify expending funds to obtain it. Defendant's failure to demonstrate prejudice from the court's decision precludes relief. *State v. Rigsby*, 160 Ariz. 178, 181–82, 772 P.2d 1, 4–5 (1989). We find no abuse of discretion, nor any evidence of prejudice to Defendant, and hold that the trial court's refusal to authorize payment for the tapes did not deprive Defendant of a fair trial or due process of law.

### C. Defendant's waiver of counsel

Defendant next argues that his waiver of counsel was invalid. He gives three reasons: (1) it was error to allow Defendant to continue to represent himself without ordering a mental competency hearing after the court learned that Defendant would be relying on a temporary insanity defense; (2) it was error to accept the waiver without specifically warning Defendant that self-representation was incompatible with an insanity defense; and (3) it is error to allow any defendant asserting an insanity defense to waive the right to counsel.

As a preliminary matter, we note that the applicable standard of review governing the issue of a defendant's waiver of counsel is not settled. This court has previously called the validity of such a waiver a question of fact, implying that a deferential standard applies. *State v. Doss*, 116 Ariz. 156, 160, 568 P.2d 1054, 1058 (1977). Courts in other jurisdictions have expressly applied deferential standards. *See, e.g., Crystal v. State*, 616 So.2d 150, 152 (Fla.App.1993) (abuse of discretion standard); *State v. Gallant*, 595 A.2d 413, 416 (Me.1991) (same); *State v. Green*, 238 Neb. 328, 470 N.W.2d 736, 745 (1991) (clearly erroneous standard). However, at least one court on habeas corpus review has described this as a mixed question of law and fact and applied a de novo standard. *See Harding v.*

Lewis, 834 F.2d 853, 857 (9th Cir.1987) cert. denied, 488 U.S. 871, 109 S.Ct. 182, 102 L.Ed.2d 151 (1988).

The parties to this case have not directly argued the standard of review to us, and we do not attempt to settle the question here. However, because Defendant has been sentenced to death we have reviewed the entire record for fundamental error, and our review has convinced us that the answer to Defendant's contentions would be the same under either a de novo or deferential standard.

### 1. *A competency hearing was not required*

■■■■■ Defendant first argues that the trial court erred by not ordering a competency hearing after the court learned that Defendant would be asserting a type of insanity defense.[1] The United States Constitution creates a delicate balance between a defendant's right to counsel and the right to proceed in propria persona. The Sixth and Fourteenth Amendments to the United States Constitution protect both of these rights. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). The right to waive counsel is therefore limited in several ways. *See generally* John S. Herbrand, Annotation, *Accused's Right to Represent Himself in State Criminal Proceeding—Modern State Cases*, 98 A.L.R.3D 13 § 2[a] (1980) (hereinafter *Accused's Right to Represent Himself*).

■■■■■ One limitation is that a waiver of counsel, to be valid, must be made knowingly, intelligently, and voluntarily. *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378 (1981); *Faretta*, 422 U.S. at 835, 95 S.Ct. at 2541. A mentally incompetent defendant cannot knowingly or intelligently waive constitutional rights. *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *Doss*, 116 Ariz. at 160, 568 P.2d at 1058; *see also Westbrook v. Arizona*, 384 U.S. 150, 86 S.Ct. 1320, 16 L.Ed.2d 429 (1966). Had Defendant been alleged to be insane at the time of trial, the trial court would have been required to hold a hearing on his competence to waive counsel, even if there had already been a finding that he was competent to stand trial. *Westbrook*, 384 U.S. at 150, 86 S.Ct. at 1320.

In the present case, however, no one has ever alleged that Defendant was mentally ill at the time of trial. In fact, Defendant's own expert witness testified at trial that Defendant was not insane at the time of trial. Rather, Defendant claimed that he had suffered from a special form of temporary insanity that was triggered by a specific event.

■■■■■ The test for whether a competency hearing is mandated is not whether a defendant was insane at some time in the past, or even whether he was free of all mental illness at the time of the waiver. *See State v. Harding*, 137 Ariz. 278, 286, 670 P.2d 383, 391 (1983) (mere diagnosis of mental illness does not necessarily preclude valid waiver); *State v. Evans*, 125 Ariz. 401, 403, 610 P.2d 35, 37 (1980) (same). Rather, it is whether, on the basis of the facts and circumstances

---

1. In addition to the errors Defendant alleges, we note that our independent review of the record discloses two minor errors in the waiver hearing. First, Ariz.R.Crim.P. 6.1(c) specifies that a waiver of counsel may be in writing and provides a form to be used. We find no indication in the record that Defendant ever signed such a form. However, Defendant submitted a signed handwritten motion to waive counsel, which was sufficient for the purposes of the rule. *Cf. State v. Harding*, 137 Ariz. 278, 287, 670 P.2d 383, 392 (1983) *cert. denied*, 465 U.S. 1013, 104 S.Ct. 1017, 79 L.Ed.2d 246 (1984) (waiver was valid even though defendant refused to sign form); *State v. Evans*, 125 Ariz. 401, 403, 610 P.2d 35, 37 (1980) (absence of written waiver not reversible error).

Second, the trial judge's statements during the hearing on Defendant's waiver of counsel suggest that the court never explicitly ruled on his motion for pro per status. Rather, the court granted the motion only in Defendant's other assault case, which was being tried during the same time period. However, the court's minute entry indicates that Defendant's motion for pro per status was granted in both cases. The disparity between the judge's in-court statements and the minute entry was at most a harmless technical error because, during the hearing, the court discussed both cases and adequately ascertained and considered the appropriate factors necessary to determine whether Defendant's waiver in this case was valid. Moreover, all parties clearly believed Defendant's motion had been granted, and Defendant later reaffirmed his choice several times during the proceedings.

known to the trial judge, there was or should have been a good faith doubt about the defendant's "ability to understand the nature and consequences of the waiver, or to participate intelligently in the proceedings and to make a reasoned choice among the alternatives presented." *Harding*, 834 F.2d at 856; *see also Cuffle v. Goldsmith*, 906 F.2d 385, 392 (9th Cir.1990); *State v. Martin*, 102 Ariz. 142, 146, 426 P.2d 639, 643 (1967). If the record raises such a doubt, then due process required the court to initiate a hearing on the defendant's competence to waive counsel.

This duty continues throughout the trial if any evidence of defendant's incompetence to waive the right to counsel and proceed in propria persona arises. *State v. Mott*, 162 Ariz. 452, 459–60, 784 P.2d 278, 285–86 (Ct.App.1990). Thus, the question in the present case is whether the evidence raised some doubt about Defendant's competence to waive counsel at the waiver hearing or at any subsequent stage of the trial. Such a doubt arises "when there is 'substantial evidence' of incompetence." *Harding*, 834 F.2d at 856; *see also Evans v. Raines*, 534 F.Supp. 791, 795 (D.Ariz.1982). "Evidence of incompetence may include, but is not limited to, the existence of a history of irrational behavior, medical opinion, and the defendant's demeanor at trial." *Evans*, 534 F.Supp. at 795.

Our review of the record shows that Defendant's behavior during the hearing and at trial gave no reason to suspect that he was mentally incompetent to understand his rights. On the contrary, Defendant listened to the judge's questions at the waiver hearing and answered them intelligently. Moreover, throughout the pretrial and trial period, Defendant prepared dozens of lucid handwritten motions and conducted himself in a rational manner, demonstrating that he understood the available alternatives and was able to make reasoned choices among them. Doubts about a defendant's competence may be removed by his conduct at trial. *State v. Conde*, 174 Ariz. 30, 33, 846 P.2d 843, 846 (Ct.App.1992). In fact, on more than one occasion Defendant asserted his *Faretta* rights in spite of the judge's remonstrations, and plainly explained the legal basis for his

position. Defendant's conduct throughout the trial thus left no doubt that he could and did understand his rights.

Moreover, in contrast to other cases in which competency hearings have been required, here Defendant's advisory counsel, who worked with him for months, never questioned his competence. *Compare Pate*, 383 U.S. at 384, 86 S.Ct. at 841 (court erred by not ordering a hearing to determine competence to stand trial where counsel insisted defendant's present sanity was in issue), *and Evans*, 534 F.Supp. at 794–98 (error not to order competency hearing on waiver of counsel where counsel and advisory counsel raised issue of competency before, during, and after trial), *with United States v. Hafen*, 726 F.2d 21, 25 (1st Cir.1984), *cert. denied*, 466 U.S. 962, 104 S.Ct. 2179, 80 L.Ed.2d 561 (1984) (upholding waiver of counsel without competency hearing in part because defendant's counsel did not question his competence at time of trial).

We conclude that the evidence did not raise any significant doubt that Defendant was competent to waive counsel and proceed in propria persona. Moreover, once a court has determined that the defendant made a competent waiver of counsel, it is not within the court's province to force counsel on the defendant. *Martin*, 102 Ariz. at 145, 426 P.2d at 642. Therefore, the court's acceptance of Defendant's waiver of counsel without ordering a competency hearing did not violate Defendant's right to due process.

### 2. *Defendant was adequately warned*

Defendant next contends that the judge should have warned him that his planned defense was incompatible with self-representation. Defendant argues that jurors simply will not believe that a person competent enough to conduct a trial could have been so insane only a short time earlier as to avoid criminal responsibility. Thus, Defendant asserts, his waiver was not intelligent because the court did not inform him of this danger, and his waiver was therefore invalid.

We disagree. In this case the trial court conducted an inquiry sufficient to ensure that

Defendant understood the dangers and disadvantages of self-representation. The judge adequately warned Defendant of the charges against him and the possible penalties. The judge also warned of several specific problems Defendant would likely face, including difficulties in investigating the case and the necessity to follow expected courtroom procedure. In addition, the judge warned, "I will tell you, I don't think it's advisable that you represent yourself in light of the serious penalties and charges that face you."

Moreover, the court, at Defendant's request, provided Defendant with advisory counsel, who was available to advise Defendant regarding strategic considerations such as whether a jury was more or less likely to believe him if he represented himself. That attorney, who had previously been Defendant's counsel of record, told the court he had strongly advised Defendant not to undertake self-representation because it was "simply the wrong choice to make." The judge questioned Defendant to ensure that he had heard those warnings as well.

■ Although a court should warn of the dangers and disadvantages generally inherent in self-representation, *Faretta*, 422 U.S. at 835, 95 S.Ct. at 2541, it is not reversible error to fail to warn of every possible strategic consideration. *Cf. Green*, 470 N.W.2d at 744 (formalistic warning is not required). In this case the court's warnings were numerous and broad enough to put Defendant on notice that self-representation was not advisable. Moreover, the court's appointment of advisory counsel ensured that Defendant had access to advice about precisely the kind of concern of which Defendant now complains. Finally, Defendant's basic strategic and pragmatic concern—convincing the jury that he was insane at the time of the crime even though he appeared sane at the time of the trial—exists in every claim of "temporary insanity," regardless of whether a defendant has counsel. There was no error.

### 3. *Insanity defense does not preclude self-representation*

■ Finally, Defendant contends that a court should never allow a defendant asserting an insanity defense to represent himself because jurors know that a judge would not allow an insane person to represent himself and therefore would not believe the insanity defense. He argues that allowing Defendant to represent himself violated his due process rights under the United States and Arizona Constitutions. We reject this argument.

■ The Sixth and Fourteenth Amendments to the United States Constitution and Ariz. Const. art. 2, § 24 guarantee criminal defendants the right to represent themselves at trial. *Faretta*, 422 U.S. at 832, 95 S.Ct. at 2539–40; *State v. De Nistor*, 143 Ariz. 407, 412, 694 P.2d 237, 242 (1985). This right is not abrogated merely by the assertion of a particular defense. Although it may not be wise to combine an insanity defense with self-representation, Defendant's argument confuses the wisdom of his waiver with its constitutional propriety. It amounts to a complaint that, even if Defendant knew what he was doing, and thus had the *right* to waive counsel, the court should have stopped him from making an unwise choice. The court does not have this power: the law guarantees a defendant the right to waive counsel if he is mentally competent to do so. *Faretta*, 422 U.S. at 834, 95 S.Ct. at 2541 (quoting *Illinois v. Allen*, 397 U.S. 337, 350–51, 90 S.Ct. 1057, 1064, 25 L.Ed.2d 353 (1970)) (although defendant may conduct defense to his own detriment, "his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.' "). We hold, therefore, that the trial court's acceptance of Defendant's waiver of counsel was not error.

### D. Trial court's refusal to allow advisory counsel to conduct the direct examination of Defendant's psychologist

■ Defendant's primary defense was that he suffered from a type of organic personality disorder called the psychotic trigger reaction syndrome. Immediately before Defendant's psychological expert was to testify concerning this theory, Defendant told the court he was unprepared to conduct the direct examination and asked the court to allow advisory counsel to conduct it instead.

The prosecutor had no objection. However, the judge stated, "Case law provides that you can't have hybrid counsel ... and I'm not going to let that occur in this case." Hybrid counsel is concurrent representation by both defendant and counsel. Advisory counsel had previously stated, "Your honor, I am dangerously close to becoming a hybrid counsel, which is disfavored in this state." The judge refused to grant the request unless Defendant withdrew his waiver of counsel permanently and allowed advisory counsel to conduct the rest of the trial.

Defendant reluctantly chose to continue to represent himself, and proceeded to conduct the direct examination of the psychologist, Dr. McMahon. Defendant now argues that because more skill is required to properly examine an expert than other witnesses and because the prosecutor had no objection, the court's refusal violated Defendant's rights to due process and assistance of counsel under the United States and Arizona Constitutions.

 Arizona does not recognize a constitutional right to hybrid representation. *State v. Cook,* 170 Ariz. 40, 48, 821 P.2d 731, 739 (1991), *cert. denied,* ─── U.S. ───, 113 S.Ct. 137, 121 L.Ed.2d 90 (1992); *State v. Rickman,* 148 Ariz. 499, 504, 715 P.2d 752, 757 (1986). Most jurisdictions follow a similar rule. *See Accused's Right to Represent Himself,* 98 A.L.R.3D at 25.

 We think, however, that the statements made at trial may reflect a misunderstanding of the law on this point. Neither our cases nor any applicable law *prohibits* hybrid counsel. Rather, we have merely held that it is not a constitutional *right. Cf. State v. Stevens,* 311 Or. 119, 806 P.2d 92, 97 (1991) (accused has no right to hybrid counsel but court may permit in its discretion); *Bradberry v. State,* 266 Ind. 530, 364 N.E.2d

1183, 1187 (1977) (citing *United States v. Gaines,* 416 F.Supp. 1047 (N.D.Ind.1976)) (same); *Scarbrough v. State,* 777 S.W.2d 83, 92 (Tex.Crim.App.1989) (same). We have never forbidden courts to allow a defendant to act as co-counsel, and some Arizona courts have done so. *See, e.g., State v. Cannon,* 127 Ariz. 147, 148–49, 618 P.2d 641, 642–43 (Ct. App.1980); *see also United States v. Aponte,* 591 F.2d 1247, 1248 (9th Cir.1978). Whether to allow such hybrid representation remains within the sound discretion of the trial judge. *Evans,* 534 F.Supp. at 797 n. 9. Thus, the judge in this case could have allowed advisory counsel to examine this crucial witness.[2]

Nevertheless, the question raised here is not whether Defendant should have been allowed to act as co-counsel throughout trial but whether the judge improperly prevented Defendant from reinvoking his right to counsel in this instance. The Arizona Rules of Criminal Procedure provide for waiver of counsel and the withdrawal of such a waiver. *See* Ariz.R.Crim.P. 6.1(c) and (e). Defendant correctly pointed out during trial that these rules do not explicitly limit how many times a defendant may switch between representation by counsel and self-representation. However, the judge in this case did not deny Defendant the right to withdraw his waiver of counsel. He clearly told Defendant:

> You ... have the right to withdraw the waiver at any time, and I accept that. And if you want to do that, fine. But at this point if you want to do that, then Mr. Avilla is your lawyer. I'm not going to let you go back and forth.

Thus, what was at issue here was not Defendant's assertion of his right to counsel but, rather, his ability to make that assertion contingent on subsequently being able to reinvoke his pro per status.

---

2. The dissent reasons that "if there is no right to hybrid representation, then the trial court has no power to allow it." *Post* at 44. This, we believe, is incorrect. Simply because a thing is not guaranteed as a right does not automatically mean it is forbidden. The United States and Arizona Constitutions guarantee certain rights but do not purport to prescribe every detail of courtroom procedure. Moreover, our rules of criminal procedure do not expressly prohibit hybrid representation.

Although we recognize the trial judge's power to permit hybrid representation, in the sense of allowing advisory counsel to participate at some point in the trial and for some specific reason, *see, e.g., Cannon,* 127 Ariz. at 148–49, 618 P.2d at 642–43, we hasten to add, as advisory counsel said in this case, that such a procedure is disfavored. It is likely to create many procedural problems and should be adopted only for very unusual, and specific reasons, and when necessary to serve the ends of justice.

A defendant's right to discharge counsel and proceed in propria persona is a qualified right once trial has begun. *State v. Strickland*, 27 Ariz.App. 695, 698, 558 P.2d 723, 726 (1976). Defendant has the right to ask that counsel be appointed to represent him midway through the trial, but the court need not stop the trial for the convenience of the defendant each time he changes his mind. *State v. DeLuna*, 110 Ariz. 497, 502, 520 P.2d 1121, 1126 (1974).

Other jurisdictions follow the same rule. "[I]t is uniformly held that all motions [for pro per status] made after jury selection has begun are untimely," and thereafter the decision to grant such a motion rests within the sound discretion of the trial court. *Accused's Right to Represent Himself*, 98 A.L.R.3D at 22; *see also Jackson v. Ylst*, 921 F.2d 882 (9th Cir.1990); *De Nistor*, 143 Ariz. at 412–13, 694 P.2d at 242–43. Denial of a defendant's untimely motion is not an abuse of discretion. *Accused's Right to Represent Himself*, 98 A.L.R.3D at 22. Thus, once Defendant invoked his right to counsel, it was within the judge's discretion not to allow him to switch back. Under these circumstances, warning Defendant in advance that the court would not allow further switching was proper. Defendant was given the opportunity to have counsel under these terms but chose not to do so. The judge's ruling was therefore not an abuse of discretion.

## E. Defendant's allegations of prosecutorial misconduct

Defendant alleges next that the prosecutor's conduct deprived him of a fair trial, complaining of two infractions.

### 1. *Prosecutor's remarks that Defendant would be set free if acquitted by reason of temporary insanity*

In the first incident, the prosecutor asked Defendant's expert witness questions designed to convey to the jury that a verdict of not guilty by reason of insanity would result in Defendant's immediate release:

Q. [K.C. Scull, Deputy County Attorney]: So, in other words, even though you assumed that he shot Daphne Dad, shot her father and did whatever else he did by way of aiming the gun around, he should walk out of the courtroom today a free man?

A. [Dr. McMahon, psychologist]: That's not my decision to make, Mr. Scull. That's the jury's.

Q. That's the ultimate result if we follow your conclusion, is it not?

A. If the jury so decides that, then—

Q. The answer is yes or no, isn't it?

A. Well, no, *because the court may very well commit him to the State Hospital for treatment.*

Q. Excuse me. Your opinion is that he is sane as he sits here today?

A. Yes.

Q. Your opinion then is that he would walk out the back door of the courtroom because he is sane.

Mr. Cornell: Objection, your honor. The question already been asked and answered numerous times.

The Court: He has not answered that.

Mr. Cornell: Your honor, he has said that—

The Court: Let me see counsel please, and we'll make a record in a minute.

Reporter's Transcript (R.T.) Nov. 15, 1990 at 83–84 (emphasis added). The trial court then sustained the objection after an unreported bench conference. Defendant argues that these and other remarks [3] were improper because they diverted the jurors' attention

---

3. As a part of this argument, Defendant also notes two other incidents in which the subject of Defendant's potential release was raised. First, during cross examination of the same witness, the prosecutor said, "And ... you visualize your role here as to try to find supportive data for a theory that will explain Joe Cornell's conduct *and set him free?*" (Emphasis added.) Later, in his closing argument, the prosecutor again touched on the subject of freedom: "[Victor Dad] hadn't even spoken to this defendant, and yet it's because supposedly of Mr. Dad causing all this problem that has got this fellow so upset. That's ... just not so, folks. That just isn't going to wash. *We have to have more than that before we tell somebody he is not guilty by reason of insanity and go and sin no more.*" (Emphasis added.) We find these indirect references less objectionable than the reference analyzed in the text and therefore do not discuss them separately.

from the issue of insanity and focused it instead on the results of an acquittal.

A long line of our cases has held that this type of statement is improper. *See State v. Purcell,* 117 Ariz. 305, 308, 572 P.2d 439, 442 (1977); *State v. Wilcynski,* 111 Ariz. 533, 535, 534 P.2d 738, 740 (1975); *State v. Makal,* 104 Ariz. 476, 477, 455 P.2d 450, 451 (1969); *State v. Jordan,* 80 Ariz. 193, 198, 294 P.2d 677, 681 (1956); *see also State v. Clark,* 110 Ariz. 242, 244, 517 P.2d 1238, 1240 (1974); *State v. Karstetter,* 110 Ariz. 539, 521 P.2d 626 (1974); *State v. Puffer,* 110 Ariz. 180, 181, 516 P.2d 316, 317 (1973). This view has long prevailed in virtually all jurisdictions. Annotation, *Prejudicial Effect of Argument or Comment that Accused, if Acquitted on Ground of Insanity, Would be Released from Institution to Which Committed,* 44 A.L.R.2D 978, 979–81 (1955).

The rhetorical questions propounded by the prosecutor suggested that if the jury accepted the defense of temporary insanity Defendant would have immediately been released. This was, of course, not entirely correct. Under Arizona law, a defendant found to have been insane at the time of a homicide would first be committed for evaluation and could be held for long-term treatment, if necessary. *See* A.R.S. § 13–3994.[4]

It is also true, however, that under the facts of this case, the prosecutor's suggestion was largely correct. Defendant contended, and his expert witness testified, that the trigger reaction producing Defendant's temporary insanity was brief and episodical in nature and that Defendant was sane at the time of trial. Thus, upon commitment, Defendant presumably could have proven that he was no longer mentally ill or dangerous and would have been entitled to release within a short period of time. The prosecutor's suggestion that Defendant would be released immediately was thus essentially true under the facts of this case. *Cf. Jordan,* 80 Ariz. at 197, 294 P.2d at 680 (statements unfairly implied that there was no possibility of detaining defendant after an acquittal).

The vice in the present case was that the questions called the jurors' attention to the issue of disposition, a matter with which they were not to be concerned.

> The principle that juries are not to consider the consequences of their verdicts is a reflection of the basic division of labor ... between judge and jury. The jury's function is to find the facts and to decide whether, on those facts, the defendant is guilty of the crime charged. The judge, by contrast, imposes sentence.... Information regarding the consequences of a verdict is therefore irrelevant to the jury's task. Moreover, providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion.

*Shannon v. United States,* —— U.S. ——, —— – ——, 114 S.Ct. 2419, 2421, 129 L.Ed.2d 459 (1994); *see also Makal,* 104 Ariz. at 477, 455 P.2d at 451 (jury is neither concerned with nor responsible for defendant's disposition). The present state of the law is set forth in *State v. McLoughlin,* 133 Ariz. 458, 461–62, 652 P.2d 531, 534–35 (1982) (defendant not entitled to instruction on disposition where an outside party told juror that defendant would be set free if acquitted by reason of temporary insanity and defendant requested disposition instruction; "disposition of a defendant ... should never be considered by the jury in its deliberations"); *State v. Jensen,* 111 Ariz. 408, 410, 531 P.2d 531, 533 (1975) (defendant not entitled to instruction on disposition even if requested); *State v. Peats,* 106 Ariz. 254, 256, 475 P.2d 238, 240 (1970) (same).

The jury was to decide the question of sanity, not the propriety of the law governing disposition after a finding of insanity. The prosecutor's questions, therefore, raised an issue that was at once irrelevant and, as noted by many of the cases cited above,

---

4. The version of A.R.S. § 13–3994 in effect at the time of the homicide provided for automatic commitment for up to fifty days without a hearing and long term detention if the defendant was unable to prove by clear and convincing evidence that he was no longer a danger to himself or others. This statute has since been amended, allowing, among other things, a longer period of detention without a hearing.

prejudicial. We must say that this experienced prosecutor should have known better than to make such remarks, and his actions seem almost calculated to bring prejudicial and irrelevant matters before the jury. His conduct jeopardized the proceedings.

■ We do not, however, reverse convictions merely to punish a prosecutor's misdeeds nor to deter future misconduct. *State v. Valdez*, 160 Ariz. 9, 14, 770 P.2d 313, 318 (1989); *State v. Skinner*, 110 Ariz. 135, 149, 515 P.2d 880, 894 (1973). Rather, although the conduct was undeniably improper, we look first to determine whether counsel's actions were reasonably likely to have affected the jury's verdict, thereby denying the defendant a fair trial. *State v. Atwood*, 171 Ariz. 576, 606, 832 P.2d 593, 623 (1992); *State v. Dumaine*, 162 Ariz. 392, 400, 783 P.2d 1184, 1192 (1989).

We note first that Defendant did not object to the colloquy between the prosecutor and the expert witness when the matter was first raised. This differs from several of the cases cited above, such as *Wilcynski, Makal,* and *Purcell,* in which the suggestion was either invited error or was introduced over objection. Even in *Jordan* it appears that an objection may have been made to the comments regarding disposition because, although the opinion does not state whether the defendant objected to the prosecutor's questions, the court discussed the prosecutorial misconduct issue but refused to consider another issue due to defendant's failure to object at trial. 80 Ariz. at 199, 294 P.2d at 681.

■ In the present case, Defendant made no objection until after several questions and answers, and then he objected on the ground of "asked and answered." This objection was eventually sustained. Whether represented or *pro se,* a defendant's failure to object constitutes a waiver of error. *Cook,* 170 Ariz. at 50, 821 P.2d at 741; *State v. Scott,* 108 Ariz. 202, 203, 495 P.2d 133, 134 (1972). We must turn, then, to the questions of prejudice and fundamental error. Given our previous cases, holding that bringing the

issue of disposition to the attention of the jury is both error and prejudicial, we will assume prejudice. *See Makal,* 104 Ariz. at 478, 455 P.2d at 452; *Jordan,* 80 Ariz. at 198, 294 P.2d at 681; *see also Evalt v. United States,* 359 F.2d 534 (9th Cir.1966) (similar argument was improper and prejudicial); *People v. Modesto,* 66 Cal.2d 695, 59 Cal. Rptr. 124, 427 P.2d 788 (1967) (same) *cert. denied,* 389 U.S. 1009, 88 S.Ct. 574, 19 L.Ed.2d 608 (1967). Thus, we turn now to the question of whether the error, and resulting prejudice, was so serious as to rise to the level of fundamental error.

■ The state argues that any prejudice engendered by the prosecutor raising the subject was mitigated by the court's standard instruction to the jurors that they were not to consider punishment when deciding Defendant's guilt or innocence. We also note that the court instructed the jury that statements of counsel are not part of the evidence and to disregard questions and answers when an objection is sustained.

We believe this argument rests on sheer speculation. The court's stock instructions were delivered some days before and after the prosecutor's prejudicial questions occurred. It is possible, of course, that some jurors were able to connect the stock instructions to the incident under examination, but it is, in our view, just as possible that they did not make that connection. It would have been much different, of course, if the court had given a specific instruction at the time the issue came up. *See, e.g., United States v. Greiser,* 502 F.2d 1295, 1298 (9th Cir.1974) (error cured in part by immediate instruction not to consider punishment); *Clark,* 110 Ariz. at 244, 517 P.2d at 1240 (error cured in part by immediate instruction to ignore improper question because objection was sustained, and it had no basis in the evidence).[5] In this case, however, we simply cannot agree that these stock instructions, unconnected in any way by chronology or reference to the incident, had any mitigating effect.

There are several other factors, however, that did tend to diminish the prejudice.

---

5. We assume for the purposes of this case that an immediate instruction would have mitigated the prejudice and not merely emphasized the prosecutor's improper insinuation.

First, the witness' answers were favorable to Defendant because the witness refuted the prosecutor's statements. The witness continued to maintain his denial even in the face of the prosecutor's repeated assertions. *Cf. People v. Ferguson,* 191 A.D.2d 809, 594 N.Y.S.2d 860, 862 (1993) (finding it a significant reason for reversal that prosecutor's suggestion was never specifically refuted). Here, it was the prosecutor's questions, not the witness' answers, that were truly prejudicial. The most precise answer the witness gave informed the jury that Defendant would not necessarily go free on a not guilty verdict because the court "may very well commit him to the State Hospital for treatment."

Second, although it is quite true that under the facts of this case the jurors might have been concerned that Defendant would have been found sane at the time of such commitment and set free, it is also true that even had the subject not been raised, this concern would probably have been on the jurors' minds. It is, simply put, a problem for defense lawyers in most temporary insanity cases. It is an even larger problem where, as in the case at bench, the defendant represents himself at trial, demonstrating to jurors his very rational thought processes, and the likelihood that he will later convince others that he should no longer be locked up. Given all this, we must concede that the prosecutor's questions raised a subject that, although technically irrelevant, would probably have been an issue in the jury room even if never mentioned at trial.[6]

■ Nevertheless, we are concerned that the prosecutor's questions may have caused prejudice to Defendant beyond that which would have otherwise been present. After all, the state claims in most cases that the issue of sentencing is both irrelevant and prejudicial to its interests. It can hardly take the opposite position in cases of alleged temporary insanity. However, if a defendant fails to object and then objects on inappropriate grounds, the issue is waived and does not require or permit reversal absent fundamental error. *State v. Vickers,* 129 Ariz. 506, 510, 633 P.2d 315, 319 (1981) (raising one objection at trial does not preserve another objection on appeal unless fundamental error) (quoting *State v. Long,* 119 Ariz. 327, 328, 580 P.2d 1181, 1182 (1978)). In this case, a timely and proper objection would have allowed the judge to prevent some of the remarks, to put an end to the line of questioning, and to promptly and cogently instruct the jury to ignore the issue of disposition. *See generally* 1 Wigmore, EVIDENCE § 18, at 793 (Tiller's rev. 1983) (errors should be corrected at the earliest practicable time) (citing *Tuttle v. Dodge,* 80 N.H. 304, 116 A. 627, 632 (1922)). Better yet, the judge could have informed the jury of the provisions of A.R.S. § 13–3994. Our search is thus for fundamental error.

■ Error is considered to be fundamental when it goes to the foundation of the case, takes from a defendant a right essential to the defense, or is of such magnitude that it cannot be said it is possible for the defendant to have had a fair trial. *Bible,* 175 Ariz. at 572, 858 P.2d at 1175. In this case, although the question is a close one, we hold that the prosecutor's conduct did not rise to the level of fundamental error. Whatever prejudice this line of questioning produced was mitigated by its brevity, by the witness' protective answers, and by the fact that the issue injected was one that undoubtedly would have been on the jurors' minds because of the nature of the defense.

Moreover, we are convinced that the erroneous injection of the issue of disposition did not cause serious harm to Defendant's case. There was no dispute that Defendant killed the victim. The only issue was his sanity, and Defendant's evidence of insanity was not persuasive. Defendant's expert witness

---

6. Our comments in this regard should not be construed as holding that the prosecutor's statements were somehow harmless because jurors are often aware that a defendant might be set free if acquitted by reason of insanity. Rather, we reaffirm our earlier holdings that such statements are highly improper and prejudicial. However, our search in the present case is for fundamental error, not merely for prejudicial error, and the jury's awareness of the fact that a defendant might be released affects the degree to which the comments prejudice the defendant. This in turn must be considered in combination with the other factors present, such as the fact in this case that the witness' answers were helpful, rather than harmful to Defendant.

based his insanity diagnosis primarily on a novel theory developed by a single psychologist in an article [7] published in a small journal, which was supported by relatively few case studies, most of which differed fundamentally from Defendant's case.

The state effectively demonstrated these weaknesses and presented the testimony of two experts that Defendant was not insane at the time of the crimes and was probably malingering. These experts also testified that the psychotic trigger syndrome theory was not generally accepted, and that even if it were, Defendant did not fit the theory.[8] During the sentencing process the trial judge, who saw and heard the actual testimony, specifically stated that "this court views [the insanity] defense as not credible." Thus, this case contrasts sharply with other cases in which reviewing courts found strong evidence of a defendant's temporary insanity, requiring reversal on the basis of remarks similar to those made by the prosecutor in the present case. *See, e.g., Makal,* 104 Ariz. at 478, 455 P.2d at 452.

This was not a close case in which the improper questions might have tipped the scales and deprived Defendant of a fair trial. From our review of the record it is evident that the weight of the evidence against Defendant would have resulted in his conviction with or without these remarks. *Cf. Mott v. State,* 94 Okl.Crim. 145, 232 P.2d 166, 179 (App.1951) (finding similar remarks to be harmless error); *State v. McDonald,* 184 S.C. 290, 192 S.E. 365, 370–71 (1937) (same), *overruled on other grounds by State v. Torrence,* 305 S.C. 45, 406 S.E.2d 315, 328 n. 5

(1991); *State v. Estes,* 655 S.W.2d 179, 185 (Tenn.Cr.App.1983) (same). We conclude therefore that this brief event, which occurred during a trial in which there was little persuasive evidence of insanity and which was mitigated by favorable witness testimony, did not amount to fundamental error.

### 2. *Prosecutor's insinuation of coaching*

During the same cross-examination of Dr. McMahon, the prosecutor asked questions implying that advisory counsel coached Defendant to feign symptoms of epilepsy: [9]

Q. Now lets talk about temporal lobe epilepsy.

A. Yes.

Q. What evidence do you have of that existing in this case?

A. The burning sickening smell [an "olfactory hallucination" allegedly perceived by defendant] is a classic sort of a sign of seizure.

Q. Okay. He could have told you that and made that up, couldn't he?

A. That's a possibility.

Q. Thank you. He has, he has advisory counsel in this case, doesn't he?

A. Yes.

Q. As far as you know—I mean you know Mr. Avilla [advisory counsel], do you not?

A. Yes.

Q. Have you worked with him before?

A. We did one other case before.

Q. Okay. As far as you know, Mr. Avilla has been consulting with Mr. Cornell

---

7. Testimony indicated that at the time of trial only one other article had been written about this theory, and it was by the same author. Defendant did not dispute this contention. We base our analysis solely on the trial testimony and express no opinion on the theory's actual scientific validity.

8. There was testimony that the crimes in the case studies were motiveless, whereas Defendant had an apparent motive—anger over his girlfriend's termination of their relationship and jealousy of her relationship with her new boyfriend. In seven of the eight case studies, the subject remembered the events well, whereas Defendant claimed to remember nothing about the shooting. Hallucination was observed among the case

study subjects, although they did not experience olfactory hallucinations. The reverse was true in the present case. In most of the case studies, the violence occurred against the person who triggered it, whereas in this case the father was supposedly the "trigger," but the daughter was chased down and killed after the father was initially shot. Finally, in most of the case studies, there was a history of severe mental illness, which was not true in the present case.

9. Dr. McMahon's diagnosis was that Defendant most likely suffered from psychotic trigger reaction syndrome, although there was a possibility that Defendant's actions were caused instead by temporal lobe epilepsy or episodic discontrol syndrome.

since December something of 1989, correct?

A. Sometime, yeah, before I was involved in the case.

 \* \* \* \* \* \*

Q. Is Mr. Avilla somewhat familiar with psychological principles?

Mr. Cornell: Objection, Your Honor. It calls for hearsay.

The Court: Well, it can be answered yes or no. And then lay some more foundation. So you can answer it yes or no.

A. No.

Q. He is not familiar with psychological principles at this level, is that what you are telling us?

A. Not at this level.

No further objection was made.

After a weekend trial break, however, advisory counsel asked the court for permission to withdraw so he could testify to rebut the insinuation that he had coached Defendant to feign having had an olfactory hallucination after the killing. The court agreed that this was the prosecutor's intended insinuation, and the prosecutor did not deny this. However, the court refused to allow advisory counsel to withdraw, ruling that the prosecutor would instead be precluded from making the coaching argument to the jury. The court also denied Defendant's request for a mistrial. Defendant now argues that these events denied him a fair trial and due process of law as guaranteed by the United States and Arizona Constitutions.

We agree with the trial court that the prosecutor undoubtedly intended these questions to place in the jurors' mind the idea that advisory counsel coached Defendant on how to feign this symptom of temporal lobe epilepsy. We have repeatedly held that a prosecutor must not make prejudicial insinuations without being prepared to prove them. *State v. Holsinger*, 124 Ariz. 18, 21, 601 P.2d 1054, 1057 (1979); *State v. Williams*, 111 Ariz. 511, 515, 533 P.2d 1146, 1150 (1975); *State v. Van Winkle*, 106 Ariz. 481, 483, 478 P.2d 105, 107 (1970); *State v. Stago*, 82 Ariz.

285, 287, 312 P.2d 160, 161 (1957); *see also State v. Ballantyne*, 128 Ariz. 68, 71, 623 P.2d 857, 860 (Ct.App.1981); *State v. Zappia*, 8 Ariz.App. 549, 553, 448 P.2d 119, 123 (1968), *cert. denied*, 396 U.S. 861, 90 S.Ct. 132, 24 L.Ed.2d 113 (1969). We find no indication in the record that this prosecutor had any evidence to back up his accusation. In addition, the comments unfairly cast aspersions on advisory counsel's integrity. We strongly disapprove of such conduct by an experienced prosecutor, and we remind the bar that this kind of misconduct can result not only in reversal, *see, e.g., Holsinger*, 124 Ariz. at 21, 601 P.2d at 1057, but can also have serious personal consequences.[10]

 Moreover, we are concerned that this conduct, and the conduct discussed in the previous section, evinced an attitude by the prosecutor that he could take advantage of the fact that Defendant was representing himself. It is true that a defendant acting in propria persona is subject to the same rules as an attorney. *Faretta*, 422 U.S. at 834 n. 46, 95 S.Ct. at 2541, n. 46; *United States v. Merrill*, 746 F.2d 458, 465 (9th Cir.1984), *cert. denied*, 469 U.S. 1165, 105 S.Ct. 926, 83 L.Ed.2d 938 (1985). It is also true, however, that a defendant's invocation of the right to self-representation does not signal playtime for prosecutors. Prosecutors have a duty to do more than convict defendants. They have a duty to see that defendants get a fair trial. *See, e.g., State ex rel. Romley v. Superior Court*, 172 Ariz. 232, 241, 836 P.2d 445, 454 (Ct.App.1992) (Lankford, J., concurring); *State v. Steen*, 623 A.2d 146, 148 (Me.1993); *State v. Gaudette*, 431 A.2d 31, 34 (Me.1981); *see also* Ariz.R.Sup.Ct. 42, ER 3.8, comment ("a prosecutor has the responsibility of a minister of justice and not simply that of an advocate").

 However, we are again faced with the fact that Defendant failed to object in a proper and timely manner. Had he done so, the court could have sustained the objection, admonished the jurors to ignore the matter, and instructed them that the inference of

---

10. We note again that we do not punish the public because of the misdeeds of its lawyer. However, we also do not allow seriously improper conduct to go unreported. *Valdez*, 160 Ariz. at 14, 770 P.2d at 318. This matter will be reported to the State Bar.

coaching had no factual basis. Failure to object and request remediation precludes Defendant from arguing the point on appeal, unless the error was fundamental.

■■■ We find that the misconduct in this instance did not rise to the level of fundamental error. The coaching charge was only made by implication, there was no evidence of it, and the witness repeatedly refuted the possibility. When the matter was brought to the judge's attention a few days later, he directed the prosecutor not to argue the point again, and the prosecutor obeyed this instruction.

Finally, we note that the prosecutor's improper questions did not tend to undermine Defendant's primary defense based on the psychotic trigger reaction theory. Rather, they only tended to discredit the theory that the killing occurred because Defendant had an epileptic seizure. Yet Defendant never presented evidence to explain to the jury how he could have committed a series of complicated, coordinated actions during an epileptic seizure.[11] Although we express no opinion on that question, we conclude that the lack of evidence on whether epilepsy occurred and how it might have exonerated Defendant weighs against this misconduct amounting to fundamental error. We hold, therefore, that these comments did not constitute fundamental error or violate Defendant's rights to due process.

Defendant also argues that the trial court erred by not allowing his advisory counsel to withdraw and testify to rebut the coaching allegations. In response to advisory counsel's request to withdraw, the court stated:

> As I said, in light of my admonition to Mr. Scull [that he may not argue coaching in his closing argument], I don't see a problem. There is no evidence in the record which suggests at all that that's what you did, that is, again, provide Mr. Cornell with

the information that he could use ... to promote his insanity defense. If you want me to admonish the jury in some respect, as far as I am concerned there is no evidence to strike. There is a question that was posed, but I think the answer given by the doctor was favorable to you. I'm not going to let you be called as a witness.

■■■ In addition to the reasons the judge gave, it appears from the record that he was concerned with delay throughout this trial and was worried that a change of counsel would result in further delay. A trial court has broad discretion in managing the conduct of a trial, and has a duty to properly exercise that discretion. *United States v. Johnson*, 618 F.2d 60, 62 (9th Cir.1980); *Pool v. Superior Court*, 139 Ariz. 98, 103–04, 677 P.2d 261, 266–67 (1984). Although we agree that it is important to conduct trials expeditiously, the trial judge's decision on this point would be debatable if the issue had gone to the heart of the defense.

■■■ A defendant's attorney is not automatically precluded from serving as a witness, especially if the attorney seeks to withdraw and the client consents, as was the case here. *See State v. Caldwell*, 117 Ariz. 464, 471–72, 573 P.2d 864, 871–72 (1977); *see also, generally*, Erwin S. Barbre, Annotation, *Defense Attorney as Witness for his Client in State Criminal Case*, 52 A.L.R.3D 887, 889 (1973). A court's refusal to allow an attorney to withdraw and testify on a defendant's behalf may be considered error of constitutional dimensions. *People v. Goldstein*, 130 Cal.App.3d 1024, 182 Cal.Rptr. 207, 211 (1982). Moreover, in this case, Defendant attempted to call only advisory counsel, not an attorney who was actively defending the case. Under these circumstances, it might have been preferable for the court to have allowed counsel to testify.

---

11. Defendant's expert admitted on cross examination that violent acts during epileptic seizures are rare. He went on to explain, however, that they are more common *between* such seizures. Nevertheless, Defendant presented no evidence that he had suffered an epileptic seizure before the attack. The burning smell he described did not occur until after the attack. There was no indication of memory loss for the time preceding

the crimes. In addition, Defendant was driving a vehicle in an apparently coordinated pursuit of the victims just before the shootings. Moreover, even if the crimes did occur between two epileptic seizures, the expert never explained to the jury why Defendant should not be held accountable for acts that took place during a time when Defendant was not having a seizure.

However, as discussed above, Defendant ultimately failed to present enough evidence to support an epilepsy defense. The inference of coaching went only to the alleged epilepsy. Rebuttal testimony was therefore not crucial because the jury surely would not have acquitted Defendant on that basis, regardless of whether Defendant had been coached. Moreover, Defendant later reopened the matter on redirect examination and elicited testimony that advisory counsel did not know enough about psychology to coach Defendant on this point. Thus, the proffered testimony could not have affected the jury's verdict, and its exclusion was harmless beyond a reasonable doubt. *State v. McVay*, 127 Ariz. 450, 453, 622 P.2d 9, 12 (1980).

## F. Equal protection challenge to Arizona's death penalty appeal statute

Defendant contends that Arizona's automatic appeal statute for death penalty cases, A.R.S. § 13–4031, violates the equal protection provisions of the United States and Arizona Constitutions because defendants convicted of capital crimes may appeal only to this court, rather than having two levels of appeal as other criminal defendants potentially do. We recently rejected an identical argument. *See State v. Ramirez*, 178 Ariz. 116, 122, 871 P.2d 237, 243 (1994). We see no need to revisit the issue.

## SENTENCING ISSUES

## A. Court's failure to order the probation officer to try to meet with Defendant to prepare the presentence report

After the jury verdicts were read, Defendant declared, "Your Honor, I'd like the record to reflect I do not wish to meet with my presentence reporter." Because of this statement, the probation officer assigned to the case did not attempt to meet with or interview Defendant. The pre-sentence report recommended that the court impose the death penalty.

Defendant argues that the court should have realized that anyone might make intemperate comments after a capital conviction and therefore should have ordered the probation officer to try to speak with Defendant, after he had time to cool down, to see if there was some basis for leniency. The court's failure to do so, Defendant contends, violated Ariz.R.Crim.P. 26.4, which requires a pre-sentence preparation of a report.

Although extending a second offer to a defendant may be appropriate in some cases, we cannot agree that failure to do so in this case requires the sentence to be vacated. A defendant has a constitutional right not to speak with a probation officer for sentencing purposes. *State v. Kerekes*, 138 Ariz. 235, 237, 673 P.2d 979, 981 (Ct.App. 1983). Defendant explicitly invoked that right and never retracted it, even though he later filed several other motions with the court. Furthermore, under Ariz.R.Crim.P. 26.3(a) and 26.4(a) a defendant may entirely waive the right to have a presentence report prepared. What occurred here was less drastic than that because the probation officer prepared a report with the material available. In addition, the judge already knew a great deal about Defendant's background from trial testimony. This is an appropriate source for sentencing information. *State v. Mincey*, 130 Ariz. 389, 414, 636 P.2d 637, 662 (1981), *cert. denied*, 455 U.S. 1003, 102 S.Ct. 1638, 71 L.Ed.2d 871 (1982). Moreover, Defendant's attorney [12] argued on his behalf at the sentencing hearing, giving the judge further perspective favorable to Defendant.

Finally, there is no indication that Defendant would have said anything to the probation officer that the court did not already know. In fact Defendant's appellate counsel admits that "it is un-likely [sic] that he would have charmed the probation officer into writing a glowing presentence report." Defendant has thus failed to show any prejudice in this regard.

Defendant expressly declared in open court that he was unwilling to meet with the probation officer, and never withdrew that

---

12. Defendant invoked his right to counsel during the sentencing process, and the court appointed advisory counsel as his attorney.

declaration. This might have been a mistake on his part, but the court's compliance with his wish was not error.

### B. Constitutional challenge to Arizona's death penalty statute on the grounds that it allows the court to conceal mitigating evidence

A.R.S. § 13–703(C) requires a sentencing court to disclose to the defendant all information in the pre-sentence report *except* "such material as the court determines is required to be withheld for the protection of human life." Defendant argues that "[i]t makes no sense to kill one person to avoid endangering the life of another." At the very least, Defendant asserts, courts should be required to seal such information and file it for appellate review.

The statute also provides that the court may not use such information in determining whether the statutory aggravating or mitigating factors exist. Defendant objects to the application of this provision to mitigating factors because it effectively prevents the judge from considering factors that cannot be disclosed, thereby depriving the defendant of his rights to due process and compulsory process and of the right to "open justice" guaranteed by Ariz. Const. art. 2, § 11.

This court has rejected a similar argument in *State v. Gillies*, 135 Ariz. 500, 508, 662 P.2d 1007, 1015 (1983), and declined to reconsider the issue in *Ramirez*, 178 Ariz. at 127, 871 P.2d at 248. Moreover, the court's special verdict in the present case specifically states: "All material in the presentence report was disclosed to the defendant and to the prosecutor." Defendant's rights were therefore not violated. *Id.* at 127–28, 871 P.2d at 248–49.

### C. Reversal of the conviction that the trial court found to be an aggravating factor

In a separate case, Defendant was charged with aggravated assault for the altercation that took place with Daphne's new boyfriend a few days before the killing. At the time of sentencing in the present case, Defendant had been convicted on that assault charge and sentenced to life imprisonment under A.R.S. § 13–604.02(A). In the present case, the trial court relied on that conviction as a statutory aggravating factor pursuant to A.R.S. § 13–703(F)(1).[13] However, the conviction was subsequently reversed on appeal. *State v. Cornell*, 173 Ariz. 599, 845 P.2d 1094 (Ct.App.1992). Defendant has now been retried and convicted of misdemeanor disorderly conduct, a lesser included offense. He submits, therefore, that his case must be remanded for resentencing. The state argues that even if the conviction can no longer be considered as an aggravating circumstance, this court should itself reweigh the remaining factors and affirm the death sentence.

■ First, we agree with Defendant that reversal of the prior conviction requires the death sentence to be reweighed. *Cf. State ex rel. Collins v. Superior Court*, 157 Ariz. 71, 754 P.2d 1346 (1988) (constitutionally infirm conviction cannot be used to enhance charge or sentencing in later proceedings); *State v. Steelman*, 126 Ariz. 19, 612 P.2d 475 (same), *cert. denied*, 449 U.S. 913, 101 S.Ct. 287, 66 L.Ed.2d 141 (1980). Arizona's statute calls for a conviction, and the conviction the court relied on has been reversed. Therefore, the remaining factors must be reweighed. *Bible*, 175 Ariz. at 606, 858 P.2d at 1209.

■ This brings us, of course, to the question of who should reweigh. The trial judge found two aggravating circumstances: the prior conviction and the fact that Defendant "knowingly created a grave risk of death to another person or persons in addition to the victim." A.R.S. § 13–703(F)(3). The trial judge found as mitigating circumstances: Defendant's age (twenty-five years) and his remorse. We are thus presented with a case in which one of the two aggravating circumstances found by the trial judge can no longer be considered and in which the

---

**13.** A.R.S. § 13–703(F)(1) provides that it is an aggravating factor if:

The defendant has been convicted of another offense in the United States for which under Arizona law a sentence of life imprisonment or death was imposable.

trial judge found more than de minimis mitigating circumstances. Where reweighing is necessary, we have stated:

> Therefore, in those cases in which the trial judge has erred in the sentencing process and there is mitigating evidence of more than de minimis weight, we will remand unless the state concedes that sentence reduction is preferable to remand.

*Bible,* 175 Ariz. at 609, 858 P.2d at 1212. We reaffirm the continuing validity of this holding.

The state has made no concession in this case that sentence reduction is preferable to remand. In other cases, however, the state has discussed the trauma caused to victims by remand for resentencing. It has frankly and commendably told this court that in many of those cases in which the court is unable to affirm the sentence of death for lack of sufficient record or because of doubt as to the inherent accuracy of the sentencing proceedings and in which the question of the sentence to be imposed is close, reduction and its consequent finality are preferable to remand. Obviously this means reduction will occur in some cases in which remand would possibly have resulted in reimposition of the death sentence, followed by a new appeal, a series of post-conviction proceedings, and ultimately resort to the federal court system.

We believe that this case is one that fits within that category. First, we note that a child survives the relationship between Defendant and Daphne. The record indicates that child is being raised by Daphne's family. Given this fact, we believe the issue of punishment should be settled quickly and finally. Second, we do not believe it is possible for this court to affirm on the present state of the record. Not only has one of the aggravating factors been ruled out, but there is an additional circumstance that raises a substantial question in our minds whether the record contains all of the mitigating evidence that could or should have been presented to the court.

This case, as noted earlier, is fraught with problems created by Defendant's decision to represent himself. After invoking and waving his right to counsel several times during the trial, he changed his mind again at the sentencing hearing and asked to have advisory counsel argue for him. When informed that he could have representation but that the hearing would proceed and he would not be allowed to waive counsel again, Defendant argued with the court but ultimately chose to be represented by counsel. Counsel then stated:

> I am at the point of being appointed and asked to proceed on a presentence hearing involving the most important issue in our society today, namely ... imposition or nonimposition of a death penalty. I am being asked to do so without having the opportunity to subpoena witnesses, the opportunity to ask my office to retain witnesses to do a psychological and physical examination of Mr. Cornell. I have not had an opportunity under these circumstances to do a life study of Mr. Cornell, nor to subpoena witnesses on his behalf to appear here to testify before this Court.

> \* \* \* \* \* \*

> Under these circumstances, forcing me to go forward is simply unfair, unfair to me, unfair to Mr. Cornell, and perhaps more importantly, unfair to our society. Before our society imposes a death penalty, before we get close to that issue, society demands that we look at every facet of the individual and ensure that the death penalty is an appropriate penalty for the crime committed and for the individual who committed it. And if we rush into judgment like this, I think we are doing harm both to the system, as well as our society. And I would ask for a sixty day continuance.

R.T. Feb. 8, 1991 at 23–24, 26.

The court denied counsel's request for a continuance, reasoning that Defendant had two and one-half months to prepare for the hearing and it was Defendant, not the court, who put counsel in the position of unpreparedness for the hearing.

We fault neither counsel nor the trial judge for his actions in this regard. However, we must conclude that we cannot reweigh with any confidence that the record contains all of the mitigating evidence and circumstances that a reasonable investigation and

preparation might have enabled counsel to present to the court and that might properly have been part of the record.[14]

Because of the need to reweigh due to the failure of one of the aggravating circumstances, given the presence of mitigating evidence found by the trial court and the balancing that is therefore required, and given the impossibility of concluding that the record before us is as complete as it should be, this court cannot affirm. Under *Bible*, we would therefore remand for resentencing. However, in light of the state's previously expressed position and the need for prompt resolution and finality because of the peculiar circumstances of this case, we believe the best resolution is reduction of the sentence.[15]

■ We therefore reduce the sentence of death to a sentence of life imprisonment without possibility of parole for twenty-five years. The life sentence is to be served consecutively to each of the sentences imposed on Defendant pursuant to his convictions in his earlier cases as well as to the sentences the trial court imposed in this case, which are twenty-one years for attempted murder,[16] fifteen years for aggravated assault, and fifteen years for burglary.

## DISPOSITION

We find that none of the issues Defendant raises on appeal warrants reversal of his convictions. We have also examined the record in this case for fundamental error pursuant to A.R.S. § 13–4035 and have found none. Defendant's death sentence, however, cannot stand because it was based on an aggravating factor that no longer exists. Accordingly, we affirm all of Defendant's convictions and sentences except the death sentence, which we reduce to life imprisonment without possibility of parole for twenty-five years, to be served consecutively to all other sentences imposed.

MOELLER, V.C.J., and CORCORAN and ZLAKET, JJ., concur.

MARTONE, Justice, concurring in part and dissenting in part.

I concur in affirming the judgment of conviction, but do not agree that hybrid representation is permitted by our rules. I dissent from the court's reduction of sentence without first giving the trial judge an opportunity to reweigh.

## I. Hybrid Representation

I do not agree that a trial judge has the discretion to allow hybrid representation. *Ante*, at 325, 878 P.2d at 1363. The court concedes that there is no right to hybrid

---

**14.** As Justice O'Connor recently remarked:

> Capital sentencing proceedings must of course satisfy the dictates of the Due Process Clause, ... and one of the hallmarks of due process in our adversary system is the defendant's ability to meet the State's case against him.

*Simmons v. South Carolina*, —— U.S. ——, ——, 114 S.Ct. 2187, 2200, 129 L.Ed.2d 133 (1994) (O'Connor, J. concurring) (internal quote marks and citations omitted).

**15.** Shortly before this opinion was filed, a newly-enacted statute, A.R.S. § 13–703.01, became effective. It provides in relevant part:

> B. If the supreme court determines that an error was made regarding a finding of aggravation or mitigation, the supreme court shall independently determine if the mitigation the supreme court finds is sufficiently substantial to warrant leniency in light of the existing aggravation. If the supreme court finds that the mitigation is not sufficiently substantial to warrant leniency, the supreme court shall affirm the death sentence. If the supreme court finds that the mitigation is sufficiently substan-

tial to warrant leniency, the supreme court shall impose a life sentence pursuant to section 13–703, subsection A.

Although this statute would arguably support our decision not to remand for resentencing, we do not rely on it for two reasons: (1) there has been no determination of its applicability to cases pending when it was enacted and went into effect; and (2) it was not raised, briefed, or argued by the parties. Accordingly, we do not address any questions of the statute's retroactivity, applicability, construction or constitutionality.

**16.** We note that the sentencing judge cited Defendant's prior aggravated assault conviction as one reason for enhancing Defendant's sentence for the attempted murder conviction. As discussed above, this conviction has been reversed. Defendant, however, has not alleged that the sentence must be vacated for that reason. Because the sentence is within the statutorily allowable maximum for the crime of attempted murder with intentional infliction of serious physical injury to the victim, we do not consider this to be fundamental error and thus do not review the issue absent a claim of error by Defendant.

representation. I am of the view that there either is a right, or there is not. If there is a right to hybrid representation, then the trial court has the power to allow it just as he has the power to allow a defendant to represent himself, or invoke his right to counsel. And the trial judge's exercise of that power is subject to review. But if there is no right to hybrid representation, then the trial judge has no power to allow it. By saying that a trial judge does have the discretion to allow it, we create the very right that we say does not exist. We will be put in the position of reviewing the trial judge's exercise of the power to allow or not to allow hybrid representation. If we should ever conclude that a trial judge abused his or her discretion in denying hybrid representation, we will have acknowledged the existence of a right to hybrid representation. But we have held that there is no such right. Thus, I reject as a matter of logic the distinction the court draws between the absence of a right to hybrid representation and the absence of any prohibition against it.

Legal representation in criminal cases is governed by Rule 6, Ariz.R.Crim.P. It occupies the field. Rule 6.1 describes the right to counsel. Rule 6.1(c) acknowledges a defendant's right to waive the right to counsel. It then provides that when a defendant waives his or her right to counsel, the court may appoint an attorney to advise him or her during any stage of the proceedings. Rule 6.1(e) allows a defendant to withdraw the waiver of the right to counsel.

It is thus clear that when a defendant waives the right to counsel, our rule only allows a court to appoint advisory counsel. There is no middle ground. When counsel represents a client, the client has no authority to represent himself. I fear today's decision will breed confusion and mischief.

## II. Remand for Reweighing

As the court notes, *ante*, at 335, 878 P.2d at 1373, when an aggravating circumstance is knocked out and when, as here, reweighing on the record is undesirable because there exists the possibility of a more substantive mitigation hearing, we remand to the trial judge for reweighing. He is the one who tried this case. He is the one who sentenced the defendant to death. He is the only one familiar enough with this record and this defendant to decide whether the death sentence should be reimposed notwithstanding the absence of one aggravating factor.

As the court notes, the state has not conceded that sentence reduction is preferable. Instead, the court arbitrarily reduces the sentence. As I have noted before, *State v. Stuard*, 176 Ariz. 589, 614, 863 P.2d 881, 906 (1993) (Martone, J., dissenting), "we have an obligation to ensure that the death sentence is not imposed in an arbitrary and freakish way." It is arbitrary to impose the death sentence on others, and then, on a record like this, relieve a defendant of the death sentence without first giving the trial judge an opportunity to properly reweigh. I therefore respectfully dissent. I would remand to the sentencing judge for reweighing.